PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4288
_____

METROPOLITAN EDISON COMPANY;
PENNSYLVANIA ELECTRIC COMPANY,
                                        Appellants

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION;
ROBERT F. POWELSON; JOHN F. COLEMAN, JR.;
PAMELA A. WITMER; *GLADYS M. BROWN; JAMES
H. CAWLEY,
In their Official Capacities as Commissioners of The
Pennsylvania Public Utility Commission; OFFICE OF
SMALL BUSINESS ADVOCATE; MET-ED INDUSTRIAL
USERS GROUP; PENELEC INDUSTRIAL CUSTOMER
ALLIANCE

*(Pursuant to Fed. R. App. P. 43(c)(2))
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-11-cv-04474)
District Judge:  Hon. James Knoll Gardner
_____

Argued
April 8, 2014

Before:  AMBRO, JORDAN and ROTH, *Circuit Judges*.

(Filed: September 16, 2014 )
_____

Bradley A. Bingaman
Morgan E. Parke
FirstEnergy Corporation
76 Main Street
Akron, OH   44308

John N. Estes, III
Karis A. Gong
Christopher R. Howland
John L. Shepherd, Jr.   [ARGUED]
Skadden, Arps, Slate, Meagher & Flom
1440 New York Avenue, NW
Washington, DC   20005

Glen R. Stuart
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA   19103
        *Counsel for Appellants*

James P. Melia
Robert F. Young
Bohdan R. Pankiw
Aspassia V. Staevska   [ARGUED]
Kenneth R. Stark
Pennsylvania Public Utility Commission
400 N. Street – 3rd Fl.
Harrisburg, PA   17102
	*Counsel for Appellees Pennsylvania Public*
	*Utility Commission, Robert F. Powelson,*
	*John F.Coleman, Jr., Pamela A. Witmer,*
	*Gladys M. Brown, James H. Cawley*

Kimberly M. Colonna
Vasiliki Karandrikas
Charis Mincavage
McNees, Wallace & Nurick
100 Pine Street
P.O. Box 1166
Harrisburg, PA   17108
	*Counsel for Intervenors-Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

This case requires us to decide the preclusive effect of a state utility agency's ruling, which has been affirmed by Pennsylvania's Commonwealth Court and denied review by the Pennsylvania Supreme Court and the United States Supreme Court. Although the Appellants, electric utility

companies Metropolitan Edison Co. ("Met-Ed") and Pennsylvania Electric Co. ("Penelec") (collectively, the "Companies"), also, in effect, invite us to review the agency's ruling on the merits, we need not and do not take that step.

The Companies' end-game appears to be to recoup from their customers more than $250 million in costs associated with "line losses" – *i.e.*, energy that is lost when electricity travels over power lines – and interest related to those costs. For reasons we will explain, the Companies' line loss costs had increased pursuant to a mandate by the Federal Energy Regulatory Commission ("FERC"), and the Companies' ability to recover those costs depended on whether line-loss costs were classified as a cost of electricity generation or as a cost of electricity transmission on their customers' utility bills. In a prior proceeding, the Pennsylvania Public Utility Commission ("PUC") rejected the Companies' proposal to classify line-loss costs as a cost of transmission, thereby preventing the Companies from passing those costs through to their customers. The Companies then pressed their arguments and lost in the Pennsylvania state courts and were denied review by the United States Supreme Court.

The Companies now seek declaratory judgment and injunctive relief in federal court against the PUC and its Commissioners in their official capacities, which would effectively set aside the result of the earlier state proceeding. The United States District Court for the Eastern District of Pennsylvania held that the Companies' unsuccessful pursuit of relief in the state proceeding precluded their effort to claim relief in federal court. In short, none of the Companies' claims survived application of the doctrine of issue

4

preclusion.  We agree and will affirm the District Court's order of dismissal.

## I.    BACKGROUND[1]

To understand the issues raised in this appeal, it is helpful to first look at the legislative and administrative framework of electricity regulation and how that framework affects the parties before us.

### A.    The Federal Power Act and the Filed Rate Doctrine

In 1935, Congress enacted the Federal Power Act ("FPA"), 16 U.S.C. § 791a *et seq.*, which authorized "federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *New York v. FERC*, 535 U.S. 1, 6 (2002) (internal quotation marks and citation omitted).  As it stands today, the FPA grants FERC jurisdiction over "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce," 16 U.S.C. § 824(a), and requires "[a]ll rates and charges … subject to the jurisdiction of the

---

[1] Consistent with our standard of review for dismissal under Federal Rule of Civil Procedure 12(b)(6), the facts from the Companies' amended complaint are taken as true. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  We also consider the documents incorporated by reference in the amended complaint.  *Id.*

Commission" to be "just and reasonable," *id.* § 824d(a).[2]  The scope of that authority, broad though it is, is meant "to extend only to those matters which are not subject to regulation by the States."  *Id.* § 824(a).

The so-called "filed rate doctrine" is an application of the FPA's statutory grant of authority to FERC.  *See Borough of Ellwood City v. FERC*, 583 F.2d 642, 648 (3d Cir. 1978) (calling the filed rate doctrine "not so much a judicially created 'doctrine' as an application of explicit statutory language").  It may be understood for our purposes as the rule that "interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates."  *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 962 (1986).  The filed rate doctrine thus "concern[s] the pre-emptive impact of federal jurisdiction … on state regulation."  *Miss. Power & Light Co. v. Mississippi*, 487 U.S. 354, 371 (1988).  The doctrine of federal pre-emption, in turn, is rooted in the Supremacy Clause of the Constitution, which provides that federal law "shall be the supreme Law of the Land[,] … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2; *see also Nantahala*, 476 U.S. at 963 (stating that the application of the filed rate doctrine to state tribunals is "a matter of enforcing the Supremacy Clause").

---

[2] The FPA originally vested authority in the Federal Power Commission, but that commission was reorganized and renamed FERC in 1977.  Department of Energy Organization Act, Pub. L. No. 95-91, § 204, 91 Stat. 565, 571 (codified at 42 U.S.C. § 7134).

### B.     The Market for Electricity

Before the passage of the FPA, electricity was usually sold by vertically integrated electric utilities that controlled their own generators, transmission lines, and local distribution networks.[3] *New York*, 535 U.S. at 5; *see also ARIPPA v. Pa. Pub. Util. Comm'n*, 792 A.2d 636, 642 (Pa. Commw. Ct. 2002) (noting that, historically, electric utilities in Pennsylvania were vertically integrated). Services were typically "bundled" together, "meaning consumers paid a single price for generation, transmission, and distribution." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004); *see also* 66 Pa. Cons. Stat. Ann. § 2802(13) (stating that the same was the case in Pennsylvania). "Although there were some interconnections among utilities, most operated as separate, local monopolies subject to state or local regulation." *New York*, 535 U.S. at 5.

Advances in technology since the enactment of the FPA have resulted in "[t]ransmission grids [that] are now largely interconnected, which means that 'any electricity that

---

[3] In contrast with a horizontally integrated monopoly, which relates to consolidation of market power "at the same level of market structure," a vertically integrated monopoly consolidates "different levels of the market structure," such as electricity generation, transmission, and distribution facilities and services. *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir. 1978); *cf. Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir. 1978) (distinguishing horizontal and vertical price-fixing).

enters the grid immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce.'" *N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 81 (3d Cir. 2014) (quoting *New York*, 535 U.S. at 7). "[T]he development of a national, interconnected grid has made it possible for a generator in one state to serve customers in another, thus opening the door to potential competition that did not previously exist." *Id.* Nevertheless, electric utilities maintained ownership of transmission lines, and, thus, "the ability to stifle competition from new generators by 'refus[ing] to deliver energy produced by competitors or [by] deliver[ing] competitors' power on terms and conditions less favorable than those they appl[ied] to their own transmissions.'" *Id.* (alterations in original) (quoting *New York*, 535 U.S. at 8-9). As a result, for many years, monopolistic tendencies still restrained competition in the market for electricity.

In 1996, FERC issued Order No. 888, a landmark ruling aimed at encouraging competition and lowering electricity rates. *See* Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996) [hereinafter Order No. 888], *aff'd in relevant part*, *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002). Significantly for this case, that Order requires the "unbundling" of wholesale generation and wholesale transmission services. *Id.* at 21,558, 21,571, 21,577-78. Each electric utility must apply the same rate for wholesale transmission services to itself and others so as to provide open access to transmission services. *Id.* at 21,541. Although FERC noted that unbundling retail services would

also be helpful to encouraging competition, Order No. 888 only required the unbundling of wholesale transmission from wholesale generation. *Id.* at 21,577.

That same year, Pennsylvania enacted the Electricity Generation Customer Choice and Competition Act (the "Electric Competition Act"), 66 Pa. Cons. Stat. Ann. § 2801 *et seq.*, which deregulated the business of electricity generation within the Commonwealth. The Electric Competition Act was designed to promote competition in the electricity market and lower retail rates for electric energy. *See* 66 Pa. Cons. Stat. Ann. § 2802(4), (7) (noting the relatively high rates for electricity in Pennsylvania and the importance of transitioning to "greater competition in the electricity generation market"); *see also ARIPPA*, 792 A.2d at 642 (stating the rationale behind the Electric Competition Act). The Act "requires electric utilities to unbundle their rates and services and to provide open access over their transmission and distribution systems to allow competitive suppliers to generate and sell electricity directly to consumers in this Commonwealth." 66 Pa. Cons. Stat. Ann. § 2802(14). Under the law, customers in Pennsylvania can purchase generation services directly from licensed "electric generation suppliers" rather than just from electric utilities. *Id.* Electric utilities, however, continue to provide the transmission and distribution of electricity, and "[i]f consumers d[o] not choose to or [a]re unable to purchase power from another supplier, the local utility [i]s still required to provide electricity to them as the Provider of Last Resort."[4] *ARIPPA*, 792 A.2d at 642 (citing 66 Pa. Cons. Stat. Ann. § 2802(16)).

---

[4] The Electric Competition Act calls electric utilities "electric distribution companies" since they do not

As a result of introducing competition into the market for electricity generation services, the Electric Competition Act left electric utilities with "transition," or "stranded," costs, which are defined as "known and measurable" generation-related costs that "traditionally would be recoverable under a regulated environment but which may not be recoverable in a competitive electric generation market and which the [PUC] determines will remain following mitigation by the electric utility."[5]  66 Pa. Cons. Stat. Ann. § 2803 (defining "[t]ransition or stranded costs").  In other words, stranded costs are costs that were incurred while an electric utility developed as a generator and supplier of power within a regulated market but that will no longer be recoverable in a more competitive market.  *Indianapolis Power & Light Co. v. Pa. Pub. Util. Comm'n*, 711 A.2d 1071, 1074 (Pa. Commw. Ct. 1998); *see also* Roger A. Greenbaum, Annotation, *Recovery of "Stranded Costs" by Utilities*, 80 A.L.R. 6th 1 (2012) ("'Stranded costs' represent that portion

---

necessarily provide customers with direct generation services anymore.  *See* 66 Pa. Cons. Stat. § 2803 (defining "[e]lectric distribution company").  For ease of reference, we will continue to refer to them as "local" or "electric" utilities.

[5] Under the Electric Competition Act, electric utilities have a "duty to mitigate generation-related transition or stranded costs to the extent practicable," which may include efforts such as accelerating the depreciation and amortization of existing generation assets, minimizing new capital spending on generation assets, and maximizing market revenues from existing generation assets.  66 Pa. Cons. Stat. Ann. § 2808(c)(4).

of … a utility's generation assets not yet recovered through [regulated rates] that has become unrecoverable in a deregulated environment."). For example, stranded costs may include a long-term investment in a generation facility that is no longer used due to deregulation of the market or other transition costs like the cost of retraining employees. 66 Pa. Cons. Stat. Ann. § 2803; *see also PECO Energy Co. v. Commonwealth*, 919 A.2d 188, 189 n.2 (Pa. 2007) ("Stranded costs … often [involve] assets with high construction costs which were due to be recuperated through the rate guaranteed under the previous monopoly system and which now will operate at a loss."); *Indianapolis Power & Light*, 711 A.2d at 1074 n.4 (explaining the main categories of stranded costs). The Electric Competition Act allows electric utilities to recover certain stranded costs through a "charge applied to the bill of every customer accessing the transmission or distribution network," separate from the charge for the actual amount of electricity consumed. *ARIPPA*, 792 A.2d at 643 (internal quotation marks omitted) (citing 66 Pa. Cons. Stat. Ann. §§ 2803, 2806(c), 2808).

To ease transition to a competitive market, the Electric Competition Act required electric utilities in the Commonwealth to submit "restructuring plans," including proposed rate schedules and plans for the recovery of stranded costs, for approval by the PUC. 66 Pa. Cons. Stat. § 2806(d)-(f). The Act outlined some restructuring standards, such as "caps" on service rates for certain periods of time in exchange for electric utilities being able to recover their stranded costs. *Id.* § 2804(4). The rate caps allowed customers to obtain electricity at the capped rates, which put downward pressure on any market rate above that level. *Cf. ARIPPA*, 792 A.2d at 643 (noting that customers would buy

11

from an electric utility as the provider of last resort if market rates rose above the capped rates). Electric utilities could seek approval from the PUC for exceptions to the rate-cap standards. 66 Pa. Cons. Stat. Ann. § 2804(4)(iii).

## C.    The Companies' Settlement Agreement

The Companies provide electricity and associated services to customers in their prescribed territories within Pennsylvania. Pursuant to passage of the Electric Competition Act, they filed restructuring plans with the PUC in 1997. In 1998, they jointly and voluntarily entered into an omnibus settlement agreement (the "Settlement Agreement") that resolved disputes related to their restructuring plans and to pending litigation in the United States District Court for the Eastern District of Pennsylvania. Of importance in the present matter, the Companies agreed to caps on "Transmission and Distribution (T&D) Charges" through December 31, 2004, as well as caps on "Generation rates" through December 31, 2010. (J.A. at 115.) Compared to the standard time-frames for rate caps under the Electric Competition Act, the periods for those agreed-upon rate caps represented extensions of three-and-a-half years on the transmission rate cap and five years on the generation rate cap. 66 Pa. Cons. Stat. Ann. § 2804(4)(i), (ii). In exchange for accepting those extensions, the Companies were given additional time to recover certain stranded costs from their customers. The PUC entered a final order approving the Settlement Agreement in October 1998.[6]

---

[6] Upon a challenge filed by a Pennsylvania state representative, the Pennsylvania Commonwealth Court upheld the PUC's final order approving the terms of the

12

### D. The Companies' Line-Loss Costs

The Companies' distribution facilities are connected to an interstate transmission grid that is overseen by PJM Interconnection, LLC ("PJM"). PJM is a regional transmission organization, a voluntary association "to which transmission providers … transfer operational control of their facilities for the purpose of efficient coordination" of the wholesale electricity market. *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1.*, 554 U.S. 527, 536 (2008). Among other things, PJM ensures that there is a sufficient amount of electricity in its regional transmission system, which reaches the District of Columbia and thirteen Mid-Atlantic and Midwest states, including Pennsylvania. *N.J. Bd. of Pub. Utils.*, 744 F.3d at 79, 82. FERC regulates the wholesale rates that PJM charges the Companies, and those rates are set forth in PJM's Open Access Transmission Tariff ("PJM's Tariff"), which is on file with FERC. Among the costs that the Companies are billed by PJM are the costs for line losses.[7] As noted earlier, line losses represent the energy

---

Settlement Agreement. *George v. Pa. Pub. Util. Comm'n*, 735 A.2d 1282 (Pa. Commw. Ct. 1999).

[7] The parties refer to lines losses interchangeably as "line losses," "marginal transmission line losses," "marginal transmission losses," and "generation line losses." (*See, e.g.*, Appellants' Opening Br. at 32, 35; Br. of PUC and PUC Commissioners at 9.) Because the dispute underlying this case relates to whether the cost of those losses should be billed to the Companies' customers as a cost of transmission or, instead, a cost of generation, we will use the neutral term "line losses" to refer to such loss of energy.

that is lost when electricity travels over power lines. PJM bills the Companies for line losses as a discrete line item within the charge for "transmission" service. (J.A. at 41-42 (Amended Complaint); *id.* at 481, 483, 486, 488, 191-92 (PJM's Tariff).)

Until June 30, 2007, PJM calculated and billed for line losses using what is called the "average loss" methodology. *See Atl. City Elec. Co. v. PJM Interconnection, LLC* (*Atlantic City I*), 115 FERC ¶ 61,132, p. 61,473 (2006), *reh'g denied*, 117 FERC ¶ 61,169. As the name suggests, PJM charged its customers for line losses "equal to the average loss cost" – PJM recovered line-loss costs by allocating the cost to all of its customers equally. *Id.* at 61,473. As a result, line-loss costs did not depend on the distance between the point of electricity generation and the point of electricity delivery. *Id.* at 61,473-74.

On March 2, 2006, several electric utilities (but not the Companies) filed a complaint with FERC alleging that, under an agreement appended to PJM's Tariff, PJM was required to switch from the average loss methodology to a "marginal loss" methodology to calculate the cost of line losses. *Id.* at 61,473. "Under the marginal loss method, the effect of losses on the marginal cost of delivering energy is factored into the energy price … at each location." *Id.* at 61,474. Thus, "[o]ther things being equal, customers near generation centers pay prices that reflect smaller marginal loss costs while customers far from generation centers pay prices that reflect higher marginal loss costs." *Id.*; *see also Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 524 (D.C. Cir. 2010) (describing the marginal loss methodology as a rate structure in which "prices are designed to reflect the least-cost of

14

meeting an incremental [energy] demand at each location on the grid, and thus prices vary based on location and time"). After issuing notice of the complaint, FERC solicited comments from numerous electric utilities and customer coalitions. *Atlantic City I*, 115 FERC at 61,474-77.

In an order issued in 2006, FERC held that the agreement appended to PJM's Tariff required PJM to use the marginal loss methodology once it was technologically feasible to do so and that PJM had conceded that it possessed the necessary technology. *Id.* at 61,477. FERC also noted that using marginal loss pricing would result in cost savings to PJM and efficiencies in resource allocation. *Id.* at 61,474, 61,477-78. Accordingly, FERC required PJM to switch from using the average loss methodology to the marginal loss methodology of calculating line losses. *Id.* at 61,478. The Companies did not participate in the comments process before FERC or challenge the resulting order. *Id.* at 61,474-77.

A few months later, FERC denied rehearing requests but granted a request to delay implementation of the marginal loss methodology to June 2007. *Atl. City Elec. Co. v. PJM Interconnection, LLC* (*Atlantic City II*), 117 FERC ¶ 61,169, pp. 61,858, 61,861 (2006). The Companies did not directly challenge that order either; in fact, they assert that "no one did." (Appellants' Opening Br. at 36.) PJM's implementation of FERC's orders to change the calculation of line-loss costs, which orders we will refer to collectively as the *Atlantic City* decision, decreased the line-loss costs for some electric utilities. However, it increased the line-loss costs that PJM billed to the Companies.

15

## II.    PROCEDURAL HISTORY

Not surprisingly, the Companies eventually sought to recover their increased line-loss costs by asking the PUC to allow them to pass the expense through to their customers. A "transmission rider," which was approved by the PUC in 2006 after the Companies' transmission rate cap had lapsed, allowed the Companies to pass through various proposed transmission costs to their customers and to engage in an annual updating and reconciliation process in order to recover projected transmission costs and adjust for the over- or under-collection of past transmission costs. *Pa. Pub. Util. Comm'n v. Metro. Edison Co.*, Nos. R-00061366C0001 *et al.*, 2007 WL 496359 (Pa. PUC Jan. 11, 2007), *aff'd sub nom. Met-Ed Indus. Users Grp. v. Pa. Pub. Util. Comm'n*, 960 A.2d 189 (Pa. Commw. Ct. 2008).   Under that annual process, the Companies proposed for the first time in April 2008 to charge their customers for the higher line-loss costs that the Companies incurred after PJM's implementation of the *Atlantic City* decision.  Because the generation rate cap under the Settlement Agreement was still in effect at that time, the Companies could only recover the line-loss costs if granted approval to bill them to customers as a cost of transmission.

### A.    The PUC Order

Pennsylvania's Office of Consumer Advocate and Office of Small Business Advocate[8] and two groups known as

---

[8] The briefing refers to the "Office of Small Business Advocate." (*See, e.g.*, Br. of PUC and PUC Commissioners at 9.)    We understand that to be an agency of the Commonwealth of Pennsylvania.

the Met-Ed Industrial Users Group and the Penelec Industrial Users Alliance (collectively, the "Customer Groups") – all representing the interests of various customers – filed complaints before the PUC to contest the Companies' proposed rate increase. They argued that line-loss costs should properly be viewed as a generation cost, not a transmission cost, and, thus, could not be increased due to the Settlement Agreement's generation rate cap in effect through the end of 2010. The Customer Groups' complaints were consolidated for a hearing before a PUC administrative law judge ("ALJ").[9] An evidentiary hearing was held after the Companies and Customer Groups completed briefing.

The ALJ recommended dismissing the Customer Groups' complaints and approving the Companies' requests to recover line-loss costs as a transmission cost. *In re Pa. Elec. Co. Transmission Serv. Charge*, Nos. M-2008-2036188 *et al.*, 2009 Pa. PUC LEXIS 2328 (July 24, 2009). The Customer Groups filed exceptions to the ALJ's recommendation, triggering review by the Commissioners of the PUC. *See* 66 Pa. Cons. Stat. Ann. § 332(h) (providing procedure for excepting to an ALJ's recommendation).

The Customer Groups argued to the PUC that line-loss costs should not be billed to them as transmission costs because (1) line losses have historically been recognized as part of the cost of electricity generation; (2) how PJM bills

---

[9] Before consolidation, the PUC had instituted an investigation of Met-Ed's proposed transmission charges and conditionally approved Penelec's proposed charges, pending resolution of the complaints.

the Companies for line losses is irrelevant to whether those losses should be billed to the Companies' customers as a generation or transmission cost; and (3) the Companies themselves have historically treated line-loss costs as generation costs. The Companies responded by (1) emphasizing how line losses are related to transmission, *i.e.*, as electricity is transmitted over longer distances, line losses increase; (2) pointing to the FERC-approved definition of "transmission losses" in PJM's Tariff;[10] and (3) arguing that PJM bills the Companies for line losses as a cost of transmission service. The Companies also claimed that they did not initially seek to recover line-loss costs as a transmission cost because, at the time, FERC had not yet mandated the use of marginal loss pricing.

The PUC in a split decision entered March 3, 2010 (the "PUC Order") ultimately rejected all of the Companies' arguments and agreed with the Customer Groups. The PUC did not adopt the ALJ's recommendation that line losses be considered a transmission cost, concluding instead that the Companies' line losses were generation costs subject to the Settlement Agreement's generation rate cap that was in effect through 2010. As the merits of the PUC Order are not before us, suffice it to say that the PUC thoroughly reviewed all of the Companies and the Customer Groups' arguments. By a three-to-two vote of the Commissioners, the agency required

---

[10] As defined in PJM's Tariff, "[t]ransmission losses refer to the loss of energy in the transmission of electricity from generation resources to load, which is dissipated as heat through transformers, transmission lines and other transmission facilities." (J.A. at 481.)

the Companies to file tariff supplements consistent with the majority's decision.[11]

## B.    Review of the PUC Order

The Companies petitioned the Pennsylvania Commonwealth Court for review of the PUC Order to the extent it denied their request to classify line-loss costs as a transmission cost.[12]  In June 2011, the Commonwealth Court, sitting *en banc*, affirmed that aspect of the PUC Order in a unanimous opinion and order.  The Commonwealth Court

---

[11]    Commissioner Powelson filed a dissenting statement, saying that the Companies' line-loss costs were a cost of transmission because, *inter alia*, they were not expressly included as a generation cost in the Settlement Agreement, and including them in transmission costs would be consistent with FERC's view of line losses.  However, he was careful to note that "[t]his is not to say that … line losses cannot be included within generation rates," and he agreed with the PUC majority that FERC's treatment of line losses "certainly is not controlling on whether the [PUC] should allow for the recovery of such losses in retail rates."  (J.A. at 165.)

[12]    The Commonwealth Court consolidated the Companies' petition with a cross-petition for review filed by Pennsylvania's Office of Small Business Advocate that sought review of the PUC Order to the extent it allowed the Companies to recover certain interest charges.  The Commonwealth Court vacated the PUC Order with respect to that issue, which is immaterial to this appeal.

reviewed whether the PUC's findings of fact – "including the [PUC's] finding that line loss costs were and are being recovered in [the] Companies' generation rates" – were supported by substantial evidence. (J.A. at 176.) The court also reviewed whether the PUC erred as a matter of law in concluding that line-loss costs are a generation cost. It found no reversible error in either regard.

Important for purposes of this appeal, the Commonwealth Court addressed the Companies' argument that classifying line-loss costs as a generation cost for purposes of retail billing "violates the Filed Rate Doctrine and is inconsistent with … FERC's characterization of line losses." (J.A. at 183.) The Companies had cited FERC decisions that allegedly treated line losses as a cost of transmission, but the Commonwealth Court held that those decisions "do not unambiguously state that such costs are transmission-related." (J.A. at 188.) As the court saw it, several of those FERC decisions included language tying line losses to the costs of generating electricity. The court thus concluded that FERC's decisions did not create any "direct conflict" with the classification of the Companies' line-loss costs as generation costs. (J.A. at 189.)

Furthermore, the Commonwealth Court held that, for two reasons, there was no impermissible "trapping" of the Companies' costs. Cost trapping, in this context, refers to a state "bar[ring] regulated utilities from passing through to retail consumers FERC-mandated wholesale rates." *Miss. Power & Light*, 487 U.S. at 372. First, the court stated that the Companies' trapping argument was "premised on the [rejected] assumption that line loss costs are transmission-related." (J.A. at 191.) Second, it determined that any

alleged trapping was resolved by the Settlement Agreement "because [the] Companies voluntarily extended th[e] [generation] rate cap through December 31, 2010 … in exchange for recovering stranded costs," thus assuming the risk that any increased costs would not be recoverable. (*Id.*) The Commonwealth Court therefore affirmed the PUC Order in relevant part, holding that the Order was not inconsistent with FERC precedent, did not run afoul of the filed rate doctrine, and did not improperly trap the Companies' costs.

The Pennsylvania Supreme Court subsequently denied the Companies' petition for allowance of appeal, and the United States Supreme Court denied the Companies' petition for a writ of certiorari. The Commonwealth Court's decision (the "State Decision") affirming the classification of line-loss costs for retail billing purposes thus became final.

### C.    The Federal Action

On July 13, 2011, while their petition for review before the Pennsylvania Supreme Court was pending, the Companies filed the present action in the District Court, naming as defendants the PUC and PUC Commissioners Robert F. Powelson, John F. Coleman, Jr., Pamela A. Witmer, Wayne E. Gardner,[13] and James H. Cawley in their official

---

[13] Gardner has since been replaced as a defendant, pursuant to Rule 43(c)(2) of the Federal Rules of Appellate Procedure, with PUC Commissioner Gladys M. Brown. *See* Fed. R. App. P. 43(c)(2) (providing that, if an officeholder who is sued in his or her official capacity ceases to hold office, the officeholder's successor is automatically substituted as a party).

capacities (collectively, the "PUC Defendants"). As originally filed, the suit claimed that the PUC Defendants had violated the FPA and the filed rate doctrine, as well as the Companies' property interests under the Fourteenth Amendment. The Companies later filed an amended complaint to add a claim that the Electric Competition Act is unconstitutional as applied. Pennsylvania's Office of Small Business Advocate, the Met-Ed Industrial Users Group, and the Penelec Industrial Users Alliance filed motions to intervene, which the District Court granted, permitting them "to intervene as defendants." (J.A. at 5 (Dkt. 41).)

The gravamen of the Companies' amended complaint is that the outcome of the state proceeding resulted in unlawful trapping of the line-loss costs that PJM charged them pursuant to FERC-approved tariffs. The Companies ultimately seek to recover the line-loss costs they incurred between 2007 and 2010.[14] Those disputed costs, including interest, allegedly total more than $250 million.[15]

Count I of the Companies' amended complaint asserts that the alleged cost-trapping violates the FPA and the filed rate doctrine. Count II alleges that the PUC Order "imposes a confiscatory rate on the Companies" by depriving them of a

---

[14] There is no dispute that the State Decision leaves them free to recover line-loss costs after the Settlement Agreement's generation rate cap lapsed at the end of 2010.

[15] According to the Companies' amended complaint in this action, the amount that they seek to recover exceeds their combined net income in 2009 and 2010.

property interest in recovering line-loss costs and, thus, violates the Due Process Clause of the Fourteenth Amendment and, by extension, the FPA's requirement that rates be just and reasonable. (J.A. at 50.) Count III claims that the Electric Competition Act is unconstitutional as applied because it is pre-empted by federal law. In sum, the Companies allege that, by barring them from recovering the line-loss costs that PJM charged them under a FERC-mandated methodology, the PUC Order violates the filed rate doctrine, the Supremacy Clause of the Constitution, the Fourteenth Amendment, and the FPA, and, to the extent the PUC and the Commonwealth Court relied on the Electric Competition Act, that statute, as applied, is pre-empted by federal law.

The PUC Defendants moved to dismiss the amended complaint,[16] arguing that the Companies' claims are barred by issue preclusion, claim preclusion, abstention principles, and judicial estoppel.[17] With respect to preclusion, the

---

[16] The District Court initially denied the motion to dismiss the amended complaint without prejudice to renew, pending resolution of the certiorari petition in the United States Supreme Court from the state proceeding. The PUC Defendants renewed their motion to dismiss after the Supreme Court denied certiorari.

[17] The PUC Defendants also raised the Full Faith and Credit Statute, 28 U.S.C. § 1738, as a separate ground for dismissal in the District Court. However, as we will explain, that statute directs us to Pennsylvania's law on preclusion. So, like the District Court, we will not examine the Full Faith and Credit Statute as a separate basis for dismissal.

23

Companies responded with three arguments for why their claims are not barred by preclusion principles: the state proceeding was legislative, rather than judicial, in nature; the Commonwealth Court reviewed the PUC's ruling under the wrong standard; and the PUC Order was facially pre-empted by FERC's exclusive jurisdiction.

After hearing oral argument on the renewed motion to dismiss, the District Court dismissed all of the Companies' claims on the basis of issue preclusion. The Companies then timely filed this appeal.[18]

---

[18] The Met-Ed Industrial Users Group and Penelec Industrial Users Alliance filed a brief before us as Intervenors-Appellees. In it, they adopt and join all of the PUC Defendants' arguments and emphasize that "the []PUC appropriately enforced the Companies' obligation under the … Settlement Agreement." (Intervenors-Appellees' Br. at 14-15.) For simplicity, we only cite to the PUC Defendants' briefing, and when we refer to the PUC Defendants in the text from this point on, that reference includes the Met-Ed Industrial Users Group and the Penelec Industrial Users Alliance as well. Pennsylvania's Office of Small Business Advocate did not file a brief on appeal.

24

## III.   DISCUSSION[19]

At the outset, it is worth emphasizing what is and is not at issue here.  The question before us is whether the State Decision – *i.e.*, the Commonwealth Court's decision that the PUC's classification of line-loss costs did not violate the filed rate doctrine or impermissibly trap costs – bars litigation of the claims in this federal action.  It is not whether the PUC correctly classified the Companies' line-loss costs as generation costs in the first instance.

---

[19] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).  The Companies argue that the Court also had jurisdiction under 16 U.S.C. § 825p, which provides federal district courts with jurisdiction to "enforce any liability or duty created by, or to enjoin any violation of [the FPA] or any rule, regulation, or order thereunder."  We have jurisdiction pursuant to 28 U.S.C. § 1291.  We exercise plenary review of a district court's order of dismissal under Federal Rule of Civil Procedure 12(b)(6), *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 451 (3d Cir. 2006), including the application of issue preclusion, *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 248-49 (3d Cir. 2006).  "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that those allegations 'could not raise a claim of entitlement to relief.'" *Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 264 (3d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)).

The Companies offer several arguments for denying the State Decision any preclusive effect, based on what they call exceptions to the application of the Full Faith and Credit Statute, 28 U.S.C. § 1738. (Appellants' Opening Br. at 29-44.) They also argue that the District Court misinterpreted the reach of the State Decision to preclude all of their claims. The PUC Defendants respond that the principles of issue preclusion properly bar the present case and, in the alternative, that dismissal would be proper under claim preclusion, abstention principles, and judicial estoppel.

## A.     Issue Preclusion

The District Court viewed the State Decision as having preclusive effect because the Commonwealth Court addressed the Companies' arguments that the PUC Order violated the filed rate doctrine and impermissibly trapped costs. Under the doctrine of issue preclusion, also referred to as collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Federal courts give preclusive effect to issues decided by state courts, to "not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system." *Id.* at 95-96. The preclusive effect of a state court judgment in a subsequent federal lawsuit is determined by the Full Faith and Credit Statute, which provides, in relevant part, that state judicial proceedings "shall have the same full faith and credit in every court within the United States … as they have by law or usage in the courts of such State … from which they are

26

taken." 28 U.S.C. § 1738. That statute has been interpreted by the Supreme Court to require a federal court to look to state law to determine the preclusive effect of a prior state judgment. *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985).

Here, there is no dispute that Pennsylvania's preclusion law applies. The Pennsylvania Supreme Court has established a five-prong test providing that issue preclusion will apply when:

> (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party … against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.[20]

*Office of Disciplinary Counsel v. Kiesewetter*, 889 A.2d 47, 50-51 (Pa. 2005).

---

[20] Some earlier Pennsylvania cases apply the same issue preclusion test but without the fifth prong regarding whether the prior determination was essential to the judgment. *E.g.*, *Shaffer v. Smith*, 673 A.2d 872, 874 (Pa. 1996).

27

As noted before, Count I of the amended complaint alleges that the PUC Order trapped the Companies' line losses in violation of the filed rate doctrine and, by extension, in violation of the FPA and the Supremacy Clause of the Constitution. The Companies do not appear to dispute that Count I meets all five of the requirements for issue preclusion under Pennsylvania law. That is wise, since (1) the Commonwealth Court squarely decided that the PUC Order did not violate the filed rate doctrine or impermissibly trap costs; (2) the court's decision was on the merits and final after both the Pennsylvania Supreme Court and the United States Supreme Court denied petitions to review the State Decision;[21] (3) the Companies were parties to the underlying state proceeding; (4) the Companies were given the opportunity to fully and fairly litigate the issue, as they were represented by counsel, filed multiple briefs, pointed to evidence from the PUC proceeding, and presented oral argument to the *en banc* Commonwealth Court;[22] and (5) the

---

[21] The Companies argue that the State Decision was a legislative action rather than an adjudication. We will address that argument when discussing the exceptions that they raise to the application of issue preclusion.

[22] "A party has been denied a full and fair opportunity to litigate only when state procedures fall below the minimum requirements of due process as defined by federal law." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1074 (3d Cir. 1990). Those minimum requirements may, depending on circumstances, include "the right to be represented by counsel, … present testimony and documentary evidence, and … subpoena and cross-examine witnesses." *Rue v. K-Mart Corp.*, 713 A.2d 82, 85 (Pa. 1998); *see also Rogin v.*

28

determination was essential to the judgment because, had the Commonwealth Court decided that there was a violation of the filed rate doctrine, it could not have affirmed the PUC Order as it did. Absent some exception, Count I is therefore barred by issue preclusion.

According to the Companies, however, their claims in Counts II and III – which allege a confiscatory taking and federal pre-emption of the Electric Competition Act, respectively – do not meet the five-prong issue preclusion test under Pennsylvania law. They argue that those claims raise new issues that were not decided in the state proceedings and that the Companies were not given a full and fair opportunity to litigate them. The PUC Defendants argue that the Companies failed to object to the application of issue preclusion to Counts II and III before the District Court, thereby waiving their arguments against preclusion of those two counts. The PUC Defendants further submit that Counts II and III, like Count I, require adjudication of the very issues that were fully litigated and decided in the state proceedings. We consider the waiver argument first.

---

*Bensalem Twp.*, 616 F.2d 680, 694 (3d Cir. 1980) (noting that elements of procedural due process include whether there is notice, a neutral arbiter, an opportunity for oral argument, an opportunity to present evidence, an opportunity to cross-examine witnesses or respond to written evidence, and an explanatory decision based on the record).

1.    *Waiver*

"[F]ailure to raise an issue in the district court constitutes a waiver of the argument." *Gass v. V.I. Tel. Corp.*, 311 F.3d 237, 246 (3d Cir. 2002) (internal quotation marks and citation omitted). "We only depart from this rule when manifest injustice would result from a failure to consider a novel issue." *Id.* (internal quotation marks and citation omitted). The Companies do not attempt to show that manifest injustice would result from a failure to consider their arguments regarding Counts II and III. Rather, they claim that there is no waiver because they "provided [the PUC Defendants] with fair notice and the grounds on which Counts II and III separately rested." (Appellants' Reply Br. at 24 (citing *Phillips v. Cnty. of Allegheney*, 515 F.3d 224, 233-35 (3d Cir. 2008)).) That argument misses the mark because, even if it were factually accurate, it relates to pleading requirements. It does not show that the Companies preserved their arguments for appeal by raising them in the District Court, and indeed they did not.

The Companies claim that they did not waive their arguments because their "[b]rief … explain[ed] why Counts II and III were not commingled with Count I." (Appellants' Reply Br. at 25.) But that argument is unavailing because the brief that they cite to is the opening brief before us, not anything that they filed in the District Court.[23] The

---

[23] The opening brief before us is the first time the Companies raised arguments regarding how issue preclusion might apply differently to Counts II and III. As the PUC Defendants point out, the Companies did not even identify

Companies also argue that they did not litigate the merits of Count III in the state proceeding, but that is an argument that Count III is not precluded; it is not a justification for failing to raise arguments specific to Count III in response to the motion to dismiss in the District Court.

The only colorable argument that the Companies make to rebut waiver is that the PUC and its Commissioners, in their motion to dismiss, "did not argue [in the first place] that Count II was barred by issue preclusion." (Appellants' Reply Br. at 25.) In that regard, the Companies are correct. As a consequence, we are not prepared to say that they were required, at the risk of waiver, to argue that issue preclusion does not apply to Count II. We will not consider the Companies' issue preclusion arguments with respect to Count II waived. The PUC and its Commissioners did, however, argue in the District Court that issue preclusion bars Counts I and III. As the Companies did not attempt to distinguish Count III in the District Court in response to the issue preclusion arguments, they waived at least their arguments as to that count.[24]

## 2. *Issue preclusion analysis*

In any event, as the PUC Defendants argue, Counts II and III of the Companies' amended complaint are both barred by issue preclusion, absent any exceptions that would

those arguments in their Concise Summary of the Case filed before us.

[24] For the reasons already discussed, issue preclusion does apply to Count I, absent any applicable exception.

31

preserve them. Count II alleges that the PUC Order "imposes a confiscatory rate on the Companies in violation of the Constitution because it deprives the Companies of their property right to recover their federally-approved costs of providing electric service, which includes marginal transmission line loss charges, to their Pennsylvania customers." (J.A. at 50.) Count II further alleges that the PUC Order is confiscatory because it violates the FPA's requirement for rates to be just and reasonable. In other words, Count II is premised on the success of the argument that the PUC Order violated the filed rate doctrine and, thus, impermissibly "trapped" the Companies' line-loss costs – the same argument that the Companies raise in Count I and that is precluded by the State Decision, absent an applicable exception. Without a legal determination that their costs were impermissibly "trapped," the Companies have no basis for asserting an unconstitutional deprivation of any property interest. Because Count II depends entirely on the same issues that were already litigated to finality in the state proceeding, it is foreclosed by issue preclusion.

A similar fate would befall Count III, even if the Companies' arguments regarding that count were not waived. Count III relates to the constitutionality of the Electric Competition Act as applied to the Companies, to the extent the PUC Order "disregard[ed] FERC orders or … interpret[ed] FERC tariffs" in violation of the filed rate doctrine. (J.A. at 51.) Although the constitutional challenge to the Electric Competition Act was not raised until the PUC made its decision, it depends, like Count II, on the Companies being able to establish that the PUC Order violated the filed rate doctrine. Again, the State Decision expressly held that

32

there was no violation of the filed rate doctrine, so Count III would also be precluded, absent any exception.[25]

### B. Exceptions to the Full Faith and Credit Statute

Although issue preclusion would typically foreclose their claims, the Companies argue that three exceptions to the Full Faith and Credit Statute apply to render the State Decision devoid of any preclusive effect: (1) the state proceeding was legislative rather than judicial in nature; (2) the Companies had a substantially higher burden of persuasion in the Commonwealth Court than they do in this federal action; and (3), under the filed rate doctrine, the PUC and the Commonwealth Court infringed on FERC's exclusive jurisdiction. **[Appellants' Opening Br. at 24-26.]** We are not persuaded that any of those exceptions apply to foreclose the application of issue preclusion in this case.

---

[25] To the extent the Companies claim that they have not had a full and fair opportunity to litigate Counts II and III, that argument is unavailing. While the Companies may not have litigated the claims set forth in Counts II and III in the state proceeding, they had a full and fair opportunity to litigate the underlying issues of whether classifying their line-loss costs as a generation cost for retail billing purposes violated the filed rate doctrine or impermissibly trapped costs.

1.  *Whether the state proceeding was legislative or judicial in nature*

The Full Faith and Credit Statute, by its terms, applies only to "judicial proceedings." 28 U.S.C. § 1738. The Companies argue that the state proceeding was legislative, not judicial, in nature, so the Full Faith and Credit Statute – and the principles of preclusion that stem from it – do not apply.

The parties do not dispute that the Supreme Court has counseled federal courts to defer to each state's characterization of its own proceedings. *See Okla. Packing Co. v. Okla. Gas & Elec. Co.*, 309 U.S. 4, 7 (1940) (looking to "[t]he pronouncements of the Oklahoma Supreme Court concerning the character of … a [prior] determination"); *Okla. Natural Gas Co. v. Russell*, 261 U.S. 290, 291 (1923) ("The Constitution of Oklahoma[] … gives an appeal to the Supreme Court of the State, acting in a legislative capacity … , with power to substitute a different order and to grant a supersedeas in the meantime."); *cf. Prentis v. Atl. Coast Line Co.*, 211 U.S. 210, 226 (1908) ("We shall assume that when[] … a state Constitution sees fit to unite legislative and judicial powers in a single hand, there is nothing to hinder, so far as the Constitution of the United States is concerned."). In addition, the Supreme Court in *New Orleans Public Service, Inc. v. Council of New Orleans* ("*NOPSI*"), 491 U.S. 350 (1989), said that the proper characterization of an agency's actions "depends not upon the character of the body but upon the character of the proceedings. … The nature of the final act determines the nature of the previous inquiry." *Id.* at 371 (first alteration in original) (internal quotation marks and citation omitted). *NOPSI* teaches that

34

[a] judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power.

*Id.* at 370-71 (internal quotation marks and citation omitted).

The Companies argue that Pennsylvania has not clearly decided whether the Commonwealth Court's review of a PUC order is legislative or judicial, while the PUC Defendants counter that the Pennsylvania Administrative Law and Procedure Act and the Pennsylvania Judicial Code unequivocally call appellate review of PUC proceedings "judicial." (PUC Defendants' Br. at 44.) The District Court concluded that the Commonwealth Court's review of the PUC Order was judicial in nature because the Commonwealth Court's authority to review PUC orders under 2 Pa. Cons. Stat. § 704 "is limited to determining whether a constitutional violation, an error of law, or a violation of PUC procedure has occurred and whether necessary findings of fact are supported by substantial evidence."[26] (J.A. at 30 (quoting *Popowsky v.*

_____

[26] Under 2 Pa. Cons. Stat. Ann. § 704, which relates to "Judicial Review of Commonwealth Agency Action":

The [reviewing] court shall hear the appeal without a jury on the record certified by the Commonwealth agency. After hearing, the court shall affirm the adjudication unless it shall

35

*Pa. Pub. Util. Comm'n*, 910 A.2d 38, 48 (Pa. 2006)) (internal quotation marks omitted).) The District Court further found support for the judicial nature of the proceeding in "the Commonwealth Court['s] reli[ance] upon past facts (as found in the proceeding before the []PUC) and existing law (as the Commonwealth Court interpreted it) to resolve a challenge to the legality of a prior action (the []PUC … Order)." (*Id.*)

The Companies contend that the District Court's reasoning was erroneous because "[i]t cannot be true that [the] commonplace standard of agency review – one that applies to both ratemaking and non-ratemaking agencies alike – makes the Commonwealth Court's decision here judicial." (Appellants' Opening Br. at 51.) In other words, they argue that the scope of the Commonwealth Court's review, alone, cannot determine whether such review is judicial or legislative in nature. That argument fails, however, because

---

> find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter A of Chapter 5 (relating to practice and procedure of Commonwealth agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa. C.S. § 706 (relating to disposition of appeals).

2 Pa. Cons. Stat. Ann. § 704.

36

the scope of agency review is not the sole basis for concluding that the State Decision was judicial rather than legislative. Other aspects of the state proceeding also indicate that it was judicial in nature.

The Companies rely on two Pennsylvania cases from the 1950s to argue that Pennsylvania courts consider their review of a state agency's rate-making to be legislative in nature. The two are a 1954 Pennsylvania Superior Court case, *Duquesne Light Co. v. Pennsylvania Public Utility Commission*, which includes the comment that "[r]ate making is an exercise of the legislative power, delegated to the Commission," 107 A.2d 745, 755 (Pa. Super. Ct. 1954), and a Pennsylvania Supreme Court opinion from 1956, *Pennsylvania State Chamber of Commerce v. Torquato*, that says "[t]he [United States Supreme] Court has permitted resort to a federal court of equity where a state was enforcing confiscatory rates and by its law precluded a stay … until the state courts 'acting in a legislative capacity' had taken final action," 125 A.2d 755, 763 (1956) (quoting *Aircraft & Diesel Equip. Corp. v. Hirsch*, 331 U.S. 752, 773 n.38 (1947)). *Duquesne*, however, relates to the nature of certain PUC rate-making; it does not dictate that all PUC actions are legislative in nature, let alone hold that the Commonwealth Court's review of a PUC decision is a legislative act. And the Pennsylvania Supreme Court in *Torquato* simply recognized that a state court acting in a legislative capacity does not necessarily establish precedent that prevents resort to a federal court; it did not hold that review of a PUC action is by definition legislative.

We recognized in *Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission*, 837 F.2d 600 (3d

37

Cir. 1988), that PUC proceedings may be judicial in nature: "When a state agency acting in a *judicial capacity* resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency factfinding the same preclusive effect to which it would be entitled in the state's courts." *Id.* at 611 (emphasis added). Moreover, Pennsylvania law recognizes that PUC action and subsequent court review can be judicial in nature. *See* 2 Pa. Cons. Stat. Ann. § 704 (Pennsylvania Administrative Law and Procedure Act describing the various dispositions when a court reviews a state agency's "adjudication"). As the PUC Defendants point out, PUC decisions can be "the product of a quasi-judicial, on-the-record proceeding that includes a presiding ALJ who has the power to administer oaths, conduct evidentiary hearings, allow for cross-examination, rule on motions, review briefs submitted by the parties, and issue recommended decisions with findings of fact and conclusions of law." (PUC Defendants' Br. at 44 (citing 66 Pa. Cons. Stat. Ann. § 331; 2 Pa. Cons. Stat. Ann. §§ 504-507).) By implication, if a state agency proceeding is judicial, appellate review of that proceeding is also judicial.

A straightforward application of the distinction between judicial and legislative inquiry outlined in *NOPSI* confirms that the Commonwealth Court decision at issue here is judicial in nature. As the District Court held, "the Commonwealth Court of Pennsylvania did not conduct an independent, forward-looking ... investigation." (J.A. at 30.) Instead, the Commonwealth Court, like the PUC, referred to and endeavored to enforce (whether correctly or not is immaterial at this juncture) the pre-existing Settlement Agreement. The Commonwealth Court further made a

38

determination specific to the Companies. It determined that there was no violation of the filed rate doctrine with respect to how the PUC required the Companies to classify their line losses, which involved a review of the record regarding how the Companies, specifically, had treated line losses in the past. At bottom, both the PUC and the Commonwealth Court adjudicated the adversarial dispute between the Customer Groups and the Companies after considering those parties' respective legal arguments. We have no difficulty holding that the state proceeding was judicial, not legislative. The nature of the state proceeding therefore does not bar the application of issue preclusion in this case.

> 2. *Whether the Companies' burdens before the Commonwealth Court and in the instant case are different*

The Companies also argue that the so-called "difference-in-burden exception" bars giving the State Decision any preclusive effect. (Appellants' Opening Br. at 44.) They rely on Section 28(4) of the Restatement (Second) of Judgments, which states that preclusion does not apply when

> [t]he party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action.

Restatement (Second) of Judgments § 28(4) (1982). The Companies do not argue that the burden of proof ever shifted to their adversaries. (*See* Oral Argument Transcript ("Tr.") at 29:11-12 ("We have the burden – either way we have the burden.").) Rather, they argue that, in reviewing the PUC Order, the Commonwealth Court applied the wrong standard of review and placed a substantially more onerous burden of persuasion on them than the Companies would face in this action. The PUC Defendants respond by arguing that "the use of the [difference-in-burden] exception is not 'well-established' in relevant case law," and that, in any event, the Companies confuse the concept of a party's *burden of proof* with a court's *standard of review*. (PUC Defendants' Br. at 42.)

According to the Companies, Section 28(4) of the Restatement is well-established because it provides the basis for the axiomatic rule that, "'even when the parties are the same, an acquittal in a criminal proceeding is not conclusive in a subsequent civil action arising out of the same event.'" (Appellants' Opening Br. at 44 (quoting Restatement (Second) of Judgments § 28 cmt. f).) A comment to Section 28 of the Restatement explains that, "[t]o apply issue preclusion in the cases described in Subsection (4) would be to hold, in effect, that the losing party in the first action would also have lost had a significantly different burden been imposed." Restatement (Second) of Judgments § 28 cmt. f.

However, we need not decide whether Pennsylvania recognizes the difference-in-burden exception, wherein a party that lost on an issue in a first proceeding is nevertheless permitted to relitigate the issue in a second proceeding if its

40

burden of proof is lower in the second proceeding.[27] Assuming such an exception exists in Pennsylvania law, the Companies have failed to show any relevant difference in burden here. They argue that a federal district court reviews an issue of federal pre-emption *de novo* as a question of law, whereas the Commonwealth Court afforded deference to the PUC's factual findings underlying the determination that line losses are not a transmission cost. Contrary to the Companies' position, the District Court was not reviewing the merits of the PUC Order, so it makes little sense to speak of the Companies' burden of persuasion in the District Court in terms of *de novo* "review." What the Companies point to is the Commonwealth Court's use of an allegedly incorrect standard of review, not a change in their own burden of proof

---

[27] We note, without holding, that Pennsylvania would appear to recognize the difference-in-burden exception under Restatement (Second) of Judgments § 28(4). The Pennsylvania Supreme Court has cited other provisions of Section 28 favorably. *See, e.g.*, *Cohen v. Workers' Comp. Appeal Bd.*, 909 A.2d 1261, 1267 n.13, 1270-71 (Pa. 2006) (declining to apply collateral estoppel for policy reasons consistent with Restatement (Second) of Judgments § 28); *Rue*, 713 A.2d at 86 (relying on Restatement (Second) of Judgments § 28(3), (5)). Moreover, the Pennsylvania Superior Court recently adopted the difference-in-burden exception. *See Weissberger v. Myers*, 90 A.3d 730, 735 (Pa. Super. Ct. 2014) ("[T]he fact that the [plaintiffs] proved fraud by the preponderance of the evidence in the Bankruptcy Court does not establish that they met their burden of proving fraud by clear and convincing evidence[,] [so] the collateral estoppel doctrine is foreclosed.").

on the merits. To the extent the Companies complain that the Commonwealth Court applied the incorrect standard of review, that argument was something to be remedied on direct appeal, not something that opens the PUC Order to collateral attack in federal court.[28] *See Del. River Port Auth. v. Fraternal Order of Police*, 290 F.3d 567, 576 (3d Cir. 2002) ("Error in a prior judgment is not a sufficient ground for refusing to give it preclusive effect."). The Companies' reliance on the Restatement (Second) of Judgments § 28(4) is therefore unpersuasive.

        3.       *Whether the PUC and the Commonwealth Court were without jurisdiction*

That brings us to the Companies' only remaining argument that the State Decision lacks any preclusive effect: that "[t]he PUC and [the] Commonwealth Court lacked subject matter jurisdiction to construe the nature of new charges imposed by a FERC transmission tariff." (Appellants' Opening Br. at 24.) We have recognized that Pennsylvania's preclusion law appears to require subject matter jurisdiction in the first proceeding for a decision made in that proceeding to have preclusive effect, *McCarter v. Mitcham*, 883 F.2d 196, 199 (3d Cir. 1989), and the PUC

---

[28] At oral argument, the Companies also raised the concern that Pennsylvania "ha[s] [its] own version of *Chevron* deference" that would not apply in federal court. (Tr. at 29:20-24, 30:17-31:8.) The Companies, however, conceded that that argument also relates to a "standard of review," not a burden of proof on the merits. (Tr. at 31:9-14.)

Defendants do not dispute that jurisdiction is a prerequisite to the application of issue preclusion in this case.

To be clear, the Companies' position is that the State Decision is "void *ab initio* for want of subject matter jurisdiction and not merely voidable as wrongly decided on the merits." (Appellants' Supp. Br. at 10.) They argue that the PUC and the Commonwealth Court "invaded th[e] exclusive federal scheme [of power regulation] by purporting to reclassify FERC-mandated interstate transmission rates as generation charges." (Appellants' Opening Br. at 32.) In other words, the Companies' jurisdictional argument is premised on the outcome of the merits in the state proceeding being adverse to them. Notably, they do not dispute that the Commonwealth Court had jurisdiction to consider the import of the filed rate doctrine to the classification of line losses. (*Id.* at 33-34 ("The Companies did not contend that the Commonwealth Court lacked subject matter jurisdiction to address the Companies' filed rate doctrine claim.").) They only dispute that the PUC and the Commonwealth Court had jurisdiction to say they lose.

We begin by emphasizing "the limited scope of review one court may conduct to determine whether a foreign court had jurisdiction to render a challenged judgment." *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 706 (1982). Generally, when fully and fairly litigated to finality, "a tribunal's determination of its own jurisdiction is accorded the same status for issue preclusion purposes as the merits of a dispute." *Crossroads Cogeneration Corp. v. Orange & Rockland Utils.*, 159 F.3d 129, 135 (3d Cir. 1998); *see also Durfee v. Duke*, 375 U.S. 106, 111 (1963) ("[A] judgment is

43

entitled to full faith and credit – even as to questions of jurisdiction – when … those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment.").

With respect to its jurisdiction, the PUC held:

[I]t is within the [PUC's] discretion whether and how to allocate costs via [the Transmission Rider] or otherwise. And, we believe it is unreasonable to suggest that the [PUC] is required to rubber stamp recovery of such costs simply because they are imposed by PJM, even when the Companies voluntarily (and properly) sought approval of their recovery from [the PUC] acting within its jurisdiction to set just and reasonable retail rates for jurisdictional transmission and distribution facilities.

(J.A. at 154.) In short, the PUC concluded that it had jurisdiction not only to consider how to classify line losses for the Companies' retail rate structure but also to resolve the classification of costs under the Settlement Agreement as it did. As the Companies have conceded, they challenged the PUC's exercise of jurisdiction on direct appeal to the Commonwealth Court and lost. (*See* Appellants' Supp. Br. at 10 ("The basis for the Companies' appeal – forum and field preemption under the FPA and filed rate doctrine – was jurisdictional, not factual.").)

Under Pennsylvania law, the Commonwealth Court has "jurisdiction of appeals from final orders of … the [PUC]." 42 Pa. Cons. Stat. Ann. § 763(a). The

44

Commonwealth Court affirmed the PUC, holding that the PUC Order "was not inconsistent with FERC precedent, did not violate the Filed Rate Doctrine, and did not improperly prevent [the] Companies from recovering trapped costs." (J.A. at 191.) On application for discretionary review to both the Pennsylvania Supreme Court and the United States Supreme Court, the Companies again argued that the state tribunals lacked authority to decide the matter adversely to the Companies. (Tr. at 22:6-11 (confirming that the Companies' petitions for discretionary review in the state proceeding sought a determination that the PUC lacked authority to make the decision that it did).) Both courts denied discretionary review, and the PUC's determination of its own jurisdiction stood as final. Typically, we would afford that determination of jurisdiction preclusive effect, and that would be the end of it.

The Companies, however, submit that their argument raises a question that we reserved in *Crossroads Cogeneration v. Orange & Rockland*: whether "an exception to the rule [of according preclusive effect to a tribunal's determination of jurisdiction] applies in a case … where a federal statute … preempts [a] state agency from acting altogether." 159 F.3d at 135. But we again do not need to reach that question because we conclude that, contrary to the Companies' position, the PUC and the Commonwealth Court were not divested of jurisdiction to act altogether in the state proceeding.

45

a.     *Whether the state tribunals have been divested of jurisdiction*

The Companies maintain that the result of the state proceeding is void for lack of jurisdiction, and it is true that "[a] void judgment is a legal nullity." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010). To be deemed void, a judgment must be "so affected by a fundamental infirmity that the infirmity may be raised even after the judgment becomes final." *Id.* "Federal courts considering [whether] a judgment is void because of a jurisdictional defect generally have reserved relief only for the exceptional case in which the court that rendered judgment lacked even an arguable basis for jurisdiction." *Id.* at 271 (internal quotation marks and citation omitted) (discussing a motion filed under Rule 60(b)(4) of the Federal Rules of Civil Procedure to render a judgment void).

Showing that a state tribunal lacked even an arguable basis for jurisdiction over a federal question is difficult because, under the principles of federalism, there is a "deeply rooted presumption in favor of concurrent state court jurisdiction." *Tafflin v. Levitt*, 493 U.S. 455, 459 (1990). Federal and state law "together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two jurisdictions are … courts of the same country, having jurisdiction partly different and partly concurrent." *Claflin v. Houseman*, 93 U.S. 130, 137 (1876). The concurrent jurisdiction of the States is "subject only to limitations imposed by the Supremacy Clause." *Tafflin*, 493 U.S. at 458; *see also Del. River Port Auth.*, 290 F.3d at 576 (noting that it is well-settled that "[s]tate courts may answer federal questions"). Indeed, "[s]o strong is the

46

presumption of concurrency that it is defeated only in two narrowly defined circumstances: first, when Congress expressly ousts state courts of jurisdiction, and second, '[w]hen a state court refuses jurisdiction because of a neutral state rule regarding the administration of the courts.'"[29] *Haywood v. Drown*, 556 U.S. 729, 735 (2009) (second alteration in original) (citations omitted). The second circumstance is not relevant here, so we focus on the first, which is typically stated in unmistakable terms:

---

[29] There seems to be some tension in the Supreme Court's jurisprudence as to how Congress may remove jurisdiction from state courts. In an earlier case, the Supreme Court said, more broadly, that Congress may divest states of jurisdiction in three ways: explicit statutory directive, unmistakable implication of the statute's legislative history, or clear incompatibility between federal interests and state jurisdiction. *Tafflin*, 493 U.S. at 459-60. However, the Companies do not point to any legislative history of the FPA or any "factors indicating clear incompatibility," such as "the desirability of uniform interpretation, expertise of federal judges in federal law, [or] the assumed greater hospitality of federal courts to peculiarly federal claims." *Id.* at 464 (internal quotation marks and citation omitted). The Companies would be hard pressed to make any such arguments, since, as cited *infra*, state courts have been recognized as properly considering issues arising under the FPA. Therefore, even under *Tafflin*'s more expansive framework, we cannot discern a clear ouster of state jurisdiction by Congress.

> In the standard fields of exclusive federal jurisdiction, the governing statutes specifically recite that suit may be brought "only" in federal court, Investment Company Act of 1940, as amended, 84 Stat. 1429, 15 U.S.C. § 80a-35(b)(5); that the jurisdiction of the federal courts shall be "exclusive," Securities Exchange Act of 1934, as amended, 48 Stat. 902, 15 U.S.C. § 78aa; Natural Gas Act of 1938, 52 Stat. 833, 15 U.S.C. § 717u; Employee Retirement Income Security Act of 1974, 88 Stat. 892, 29 U.S.C. § 1132(e)(1); or indeed even that the jurisdiction of the federal courts shall be "exclusive of the courts of the States," 18 U.S.C. § 3231 (criminal cases); 28 U.S.C. §§ 1333 (admiralty, maritime, and prize cases), 1334 (bankruptcy cases), 1338 (patent, plant variety protection, and copyright cases), 1351 (actions against consuls or vice consuls of foreign states), 1355 (actions for recovery or enforcement of fine, penalty, or forfeiture incurred under Act of Congress), 1356 (seizures on land or water not within admiralty and maritime jurisdiction).

*Tafflin*, 493 U.S. at 471.

The Companies are correct that the FPA grants FERC exclusive jurisdiction over certain matters, but the relevant question here is whether Congress divested state utility agencies or state courts of jurisdiction to hear cases requiring an adjudication of the filed rate doctrine's scope, and the answer to that is no. The FPA plainly leaves a role for states

48

in electricity regulation.[30] While section 201(b) of the FPA grants federal regulatory authority as to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce,"[31] 16

---

[30] Our dissenting colleague asserts that Congress, through the FPA, "divest[ed] states of jurisdiction to interpret FERC orders that define the elements of the rates of transmission facilities, such as PJM." (Dissenting Op. at 7.) The authorities she cites for that proposition, however, are two cases reviewing whether FERC had jurisdiction to make certain other determinations. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 911 F.2d 993, 1001 (5th Cir. 1990) ("We must decide whether FERC has jurisdiction to determine whether [the public utility] acted prudently once the … project [at issue to build nuclear reactors] was underway."); *N.J. Bd. of Pub. Utils.*, 744 F.3d at 95-96 (reviewing whether FERC's elimination of a state-mandated exception was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (internal quotation marks omitted) (quoting 5 U.S.C. § 706(2)(C))). It is neither troubling nor surprising that the PUC's adjudication here required the interpretation of FERC orders. Adjudication of the reach of the filed rate doctrine will in some cases necessarily involve looking to and interpreting FERC decisions.

[31] "Furthermore, § 205 of the FPA prohibited, among other things, unreasonable rates and undue discrimination 'with respect to any transmission or sale subject to the jurisdiction of [FERC],' 16 U.S.C. §§ 824d(a)-(b), and § 206 gave [FERC] the power to correct such unlawful practices, 16 U.S.C. § 824e(a)." *New York*, 535 U.S. at 7.

U.S.C. § 824(b)(1), at the same time, it provides that federal regulation is "to extend only to those matters which are not subject to regulation by the States," *id.* § 824(a). Thus, in enacting the FPA, Congress expressly envisioned a role for state utility agencies in electricity regulation, which may well require consideration of the import of the filed rate doctrine. *Cf. Crossroads*, 159 F.3d at 135 ("Given the substantial role given state utility agencies by Congress in enacting [the Public Utility Regulatory Policies Act], we conclude Congress did not intend to prevent application of common law rules of preclusion.").

Nevertheless, the Companies submit that the PUC and Commonwealth Court so exceeded the scope of their authority under the "preemptive force of the federal regulatory scheme" of the FPA and the filed rate doctrine that those tribunals utterly lacked jurisdiction. (Appellants' Opening Br. at 29.) The Companies point out that a federal statute or regulation may pre-empt state regulation in three ways. First, under express pre-emption, Congress can pre-empt state law by explicit statutory language. *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996). Second, under field pre-emption, Congress can enact a regulatory scheme "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* at 31 (internal quotation marks and citation omitted). And third, "federal law may be in 'irreconcilable conflict' with state law," which creates what is known as conflict pre-emption.[32] *Id.* (internal quotation

---

[32] Field pre-emption and conflict pre-emption can be characterized as falling under "implied," as opposed to "express," pre-emption. *See Roth v. Norfalco LLC*, 651 F.3d

marks and citation omitted). The Companies have cast their net widely, arguing that "[t]his case concerns all three" types of pre-emption.[33] (Appellants' Supp. Br. at 1.) Not ones to

---

367, 374 (3d Cir. 2011). We recognize, though, "that the categories of preemption are not 'rigidly distinct.'" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990)).

[33] At oral argument, we asked the parties to submit supplemental briefing on whether pre-emption may be waived. The PUC Defendants argue that the Companies waived their pre-emption arguments by entering into the Settlement Agreement. They point to a provision in the agreement that provides, in part, that the Companies "agree that they shall not initiate or join in any court challenge, arising out of the issues resolved by this Settlement, to the constitutionality or legality of the Electric Competition Act such that would prevent or preclude implementation of this Settlement." (Supp. App. at 70.) There may be an argument that the Companies, pursuant to that provision, waived their ability to bring Count III to challenge the constitutionality of the Electric Competition Act as applied. We need not reach that conclusion, though, because, as we have already discussed, *see supra* Part III.A.1, the Companies waived any argument that Count III rises or falls separately from Count I for purposes of issue preclusion.

The PUC Defendants also submit that, by fully arguing pre-emption in the Commonwealth Court, the Companies have waived their ability to raise pre-emption in federal court. But that is not a waiver argument related to the Companies' *failure* to raise an argument when it should have. It simply

51

shy from emphatic declarations, they submit that the filed rate doctrine is "a uniquely sweeping and clear manifestation of field preemption" that divests states of jurisdiction to classify line losses as generation costs in a retail rate structure. (Appellants' Opening Br. at 29.) We cannot concur.

As we have recently noted, pre-emption arguments do not ordinarily raise issues of subject matter jurisdiction. *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 464 n.1 (3d Cir. 2013) ("[W]e must clarify that our prior decision did not imply … that Rule 12(b)(1) [of the Federal Rules of Civil Procedure] is the right vehicle for ordinary preemption arguments."). That is because "[p]reemption arguments, other than complete preemption, relate to the merits of the case." *Id.* (citing *In re U.S. Healthcare, Inc.*, 193 F.3d 151, 160 (3d Cir. 1999)); *see also Joyce v. RJR Nabisco Holdings Corp.*, 126 F.3d 166, 171 (3d Cir. 1997) (pointing out the distinction "between the complete preemption doctrine for jurisdictional purposes and ordinary preemption, which merely constitutes a defense to a state law cause of action").

While the Supreme Court has said that "[d]octrines of federal pre-emption … may in some contexts be controlling" over "the general rule of finality of jurisdictional determinations," *Durfee*, 375 U.S. at 114, this case does not

restates the PUC Defendants' view that the State Decision – having been fully litigated – should bar the Companies from relitigating the issue of pre-emption. We are satisfied from a review of the record that the Companies timely raised their pre-emption arguments in the District Court.

present such an exception. In the *Atlantic City* decision on which the Companies so heavily rely, FERC required PJM to factor marginal line losses into the energy price at each location. *Atlantic City I*, 115 FERC at 61,473-74. Certain FERC language from that decision certainly does highlight the connection between line losses and the transmission of electricity. *See, e.g.*, *id.* at 61,473 ("As in the case of all electric transmission, there is some loss … as … power is transmitted from the point of generation to the point of delivery."). But the agency did not say that line losses should be categorized as a cost of transmission, and indeed it made comments that can be read as supporting the view that line losses could be understood as a factor in electricity generation. It noted, for example, that "[s]uch loss[es] result[] in a cost PJM incurs to maintain the level of the scheduled power and to deliver it under conditions of system reliability." *Id.* at 61,473.[34] In the end, the FERC orders that the parties point us to require PJM to calculate line losses in a certain way but do not make the kind of categorical statements that lead to pre-emption and override the finality of the state ruling the Companies themselves sought. That is in sharp contrast with a case like *Nantahala Power & Light Co. v. Thornburg*, in which the Supreme Court held that FERC's express allotment of entitlement power to two owners of hydroelectric power plants pre-empted a state agency's retail rate-making order allocating entitlement power differently. 476 U.S. at 955, 958.

_____

[34] We are not suggesting that FERC would endorse what the PUC and the Commonwealth Court decided. Our dissenting colleague has ably discussed why that can be doubted. We eschew any comments on the merits beyond our observation that there is no definitive FERC ruling.

The Companies also try to rely on "complete pre-emption," which is jurisprudentially distinct from the three "ordinary" types of pre-emption – express, field, and conflict pre-emption – described above. *Ry. Labor Exec. Ass'n v. Pittsburgh & Lake Erie R.R. Co.*, 858 F.2d 936, 939 (3d Cir. 1988); *see also Lontz v. Tharp*, 413 F.3d 435, 440 (4th Cir. 2005) ("[W]e may not conflate 'complete preemption' with … 'ordinary' preemption. While these two concepts are linguistically related, they are not as close kin jurisprudentially as their names might suggest. Complete pre-emption is a 'jurisdictional doctrine,' while ordinary preemption simply declares the primacy of federal law, regardless of the forum or the claim."). Under complete pre-emption, "the pre-emptive force of a statute is so 'extraordinary' that it 'converts'" a state-law complaint into a federal one. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)).

Complete pre-emption, however, stands as a limited exception to the well-pleaded complaint rule, *i.e.*, the rule that "a case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Id.* Complete pre-emption, in other words, arises in the context of removal jurisdiction. It serves as a basis for federal jurisdiction over causes of action that may appear, on their face, to be based on state law but that are in truth only actionable under federal law due to Congress's clear intent "to completely pre-empt a particular area of law." *U.S. Healthcare*, 193 F.3d at 160 (internal quotation marks and citation omitted). It does not resolve

whether state tribunals have been wholly divested of jurisdiction to hear the federal cause of action.[35]  *Cf. Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 560 n.2 (1968) (recognizing that a state court may retain jurisdiction over an action that is completely pre-empted if the defendant does not elect to have the case removed to federal court).  The Companies have cited no cases to indicate otherwise.  Perhaps recognizing that the doctrine is not the best vehicle for their argument, they did not even raise complete pre-

---

[35] We have some doubt that either the FPA or the filed rate doctrine effects a complete pre-emption of state law. "The Supreme Court has recognized the 'complete preemption' doctrine in only three instances: § 301 of the [Labor Management Relations Act]; § 502(a) of [the Employee Retirement Income Security Act of 1974]; and §§ 85 and 86 of the National Bank Act." *N.J. Carpenters v. Tishman Constr. Corp.*, -- F.3d --, 2014 WL 3702591, at *4 (3d Cir. 2014) (citations omitted).  With respect to whether the FPA completely pre-empts state law, the United States Court of Appeals for the Seventh Circuit has observed that "nearly all of the other courts that have considered the question [have] conclude[d] that the [FPA] does not completely preempt state law. … [F]ederal law leaves a role for state law in wholesale power regulation." *Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 893, 895 (7th Cir. 2013).  The Seventh Circuit also held that the filed rate doctrine does not completely pre-empt state law because that doctrine is "properly treated as a federal defense rather than an affirmative basis for jurisdiction." *Id.* at 896.

emption, used as a term of art, until oral argument. (Tr. at 5:22-24 (saying that field pre-emption and conflict pre-emption in this case "add up to complete preemption").) That has the look of a waiver, but even assuming, *arguendo*, that the Companies have not waived their argument, complete pre-emption has no place in this discussion.

Furthermore, history matters here. The Supreme Court has recognized, without indicating that there were any jurisdictional defects, that "state courts have examined th[e] interplay [of the filed rate doctrine] in determining the effect of FERC-approved wholesale power rates on retail rates for electricity." *Nantahala*, 476 U.S. at 964-65; *see also Gen. Motors Corp. v. Ill. Commerce Comm'n*, 574 N.E.2d 650, 655 (Ill. 1991) (deciding whether a state utility agency's action violated the filed rate doctrine); *Me. Yankee Atomic Power Co. v. Me. Pub. Utils. Comm'n*, 581 A.2d 799, 804-05 (Me. 1990) (same); *Pa. Power Co. v. Pa. Pub. Util. Comm'n*, 561 A.2d 43, 49-52 (Pa. Commw. Ct. 1989) (same). Binding precedent instructs that, "when a state proceeding presents a federal issue, even a pre-emption issue, the proper course is to seek resolution of that issue by the state court." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 149-50 (1988). Thus, despite the Companies' attempt to craft a way for us to review whether the State Decision complies with their interpretation of the FPA and the filed rate doctrine, we cannot say that the PUC and the Commonwealth Court "lacked even an arguable basis for jurisdiction," *Espinosa*, 559 U.S. at 270, to decide the merits of classifying line losses for purposes of a retail rate structure. As the PUC and the Commonwealth Court were not divested of authority to act altogether, the result of the state proceeding is not void on that ground.

56

*b.* *Whether the state proceedings were an impermissible "collateral attack" on a FERC decision*

The Companies also argue that the FPA explicitly proscribes the state agencies and courts, as improper forums, from resolving the dispute between the Companies and the Customer Groups such that the state proceedings were an impermissible "collateral attack" on a FERC decision.  The United States Supreme Court in *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320 (1958), held that, pursuant to FPA § 313(b), "Congress … prescribed the specific, complete and exclusive mode for judicial review of the Commission's orders," which consists of direct review by a federal circuit court of appeals and, possibly, the United States Supreme Court.[36]  *Id.* at 336.  Direct review of FERC's orders

---

[36] FPA § 313(b) provides, in relevant part:

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located … by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. … Upon the filing of such petition *such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm,*

necessarily preclude[s] *de novo* litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review. Hence, upon judicial review of the Commission's order, all objections to the order, to the license it directs to be issued, and to the legal competence of the licensee to execute its terms, must be made in the Court of Appeals or not at all.

*Id.* (footnote omitted). Emphasizing that the rule bars tribunals – with the exception of federal circuit courts and the United States Supreme Court – from hearing direct challenges to FERC orders, the Companies claim it shows a jurisdictional deficiency with the state proceeding. Their argument is akin to what we have referred to as "forum pre-emption":

*modify, or set aside such order in whole or in part.* … The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification … .

16 U.S.C. § 825l(b) (emphasis added). The relevant language of that provision has not changed materially since the *City of Tacoma* decision, except that when that opinion issued, exclusive jurisdiction attained "[u]pon the filing of [the] transcript" from the challenged FERC proceeding. 16 U.S.C. § 825l(b) (1958).

58

> When Congress intends a particular forum to have exclusive jurisdiction … , that policy decision deprives other fora of subject matter jurisdiction. This doctrine of "forum preemption" implements Congressional determinations that development of the substantive law in a particular area should be left to a particular administrative agency created for that purpose.

*Ry. Labor Execs. Ass'n v. Pittsburgh & L.E.R. Co.*, 858 F.2d 936, 943 (3d Cir. 1988); *see also Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 388 (1986) ("It is clearly within Congress' powers to establish an exclusive federal forum to adjudicate issues of federal law in a particular area that Congress has the authority to regulate under the Constitution.").

The Companies argue that, to the extent the Customer Groups had any grievances regarding the proposed line losses, they could and should have brought their grievances in a federal court of appeals on direct appeal of a FERC order, rather than waiting to contest the Companies' proposed rates before the PUC in a separate proceeding. However, the issue in the state proceeding – whether the Companies could classify line losses as transmission charges – was not an issue arising from any FERC order that the Companies have identified. To the extent the Companies complain that the Customer Groups should have directly appealed the *Atlantic City* decision, their argument is misplaced. The Customer Groups did not challenge how FERC has mandated PJM to calculate its line losses. If anything, the classification of the Companies' line-loss costs for retail billing was an issue

made relevant by the voluntarily agreed-upon terms of the Settlement Agreement, which provided different end dates on transmission rate caps and generation rate caps.[37]

c.    *Conclusion on state jurisdiction*

Ultimately, for purposes of jurisdiction, we need not resolve whether the Companies are correct that their interpretation of line losses is required under FERC's regulatory scheme or that the Commonwealth Court improperly deferred to certain aspects of the PUC Order.  *Cf. Decker v. Nw. Envtl. Defense Ctr.*, 133 S. Ct. 1326, 1335 (2013) ("For jurisdictional purposes, it is unnecessary to determine whether [the respondent] is correct in arguing that only its readings of the [relevant] Rule is permitted under the [Clean Water] Act."); *Avco*, 390 U.S. at 561 ("Any error in granting … relief does not go to the jurisdiction of the court." (internal quotation marks and citation omitted)).

The Companies have not cited a single instance in which a party has been allowed to litigate a substantive issue all the way through the state courts and a petition for certiorari to the United States Supreme Court and then subsequently argue that the state courts lacked jurisdiction in the first place.  The closest case is *Southern Union Co. v. FERC*, 857 F.2d 812 (D.C. Cir. 1988), in which the United States Court of Appeals for the District of Columbia Circuit declined to apply issue preclusion "with its full rigor" and

---

[37] The Companies themselves, who were adversely affected by the *Atlantic City* decision, did not mount any challenge to that FERC order.

decided that a state court had no power to enforce a damage award that effectively awarded a price for interstate gas that was under FERC's exclusive jurisdiction. *Id.* at 816. However, *Southern Union* is distinguishable because the D.C. Circuit's rationale for not applying issue preclusion rested on "the distinct possibility that the [United States Supreme] Court may have declined to issue … [a] writ [of certiorari] in deference to the pendency of the proceedings [in FERC]." *Id.* We have no such indication here prompting us to set aside the result of a state proceeding that has been litigated to finality and denied review by the United States Supreme Court.[38]

The Companies also cite several Supreme Court decisions in which actions by state utility agencies were held to be pre-empted by FERC actions. *See Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39 (2003); *Miss. Power & Light*, 487 U.S. at 356-57; *Nantahala*, 476 U.S. at 955. But those decisions were all made on direct review from state agency decisions. *Entergy*, 539 U.S. at 49-50; *Miss. Power & Light*, 487 U.S. at 373-75; *Nantahala*, 476 U.S. at 970-72. Here, the United States Supreme Court denied discretionary review, rendering the State Decision final. We have held that, "[i]f [a state tribunal] answered federal questions erroneously, it remained for state appellate courts, and ultimately for the United States Supreme Court, to correct any mistakes. Error in a prior judgment is not a sufficient ground for refusing to

---

[38] To be clear, we agree with our dissenting colleague that "[t]he fact that the Supreme Court did not grant certiorari does not mean that [a] question may not be validly raised in federal district court." (Dissenting Op. at 14 n.3.) As *Southern Union* illustrates, there may be exceptions.

61

give it preclusive effect."[39] *Del. River Port Auth.*, 290 F.3d at 576. The Supreme Court's decisions in *Entergy*, *Mississippi Power & Light*, and *Nantahala* support the conclusion that any error in the application of the filed rate doctrine should have been corrected on direct appeal of the PUC Order.

Moreover, "[t]here is … no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all." *San Remo Hotel, L.P. v. San Francisco*, 545 U.S. 323, 343 (2005) (internal quotation marks and citation omitted). Here, the Companies have even less reason to complain, as they affirmatively chose to litigate their case through the state system. They admit that "[t]here was nothing preventing

---

[39] Although we have no occasion to revisit the substance of the PUC Order, it is worth noting that FERC has gone to some lengths to reserve to state agencies various issues regarding the potential recovery of retail costs. *See Exelon Corp. v. PPL Elec. Utils. Corp.*, EL05-49-000, EL05-49-001, 117 FERC ¶ 61,176, p. 61,876 (Nov. 9, 2006) (stating that "issues involving potential recovery of costs from retail customers are within the province of the state" and that, in approving a settlement, FERC was "not specifically endorsing … characterizations" of the charges as transmission related); *Va. Elec. & Power Co.*, ER08-1540-000, 125 FERC ¶ 61,391, p. 62,845 (Dec. 31, 2008) (approving tariff revisions but leaving "the issue of whether, or under what circumstances, [wholesale] costs may be recovered in retail rates" to the state).

[them] from going to FERC" and that, had they obtained a favorable ruling from FERC, they could have enforced it. (Tr. at 7:3-8:9; *see also id.* at 21:8-19 (stating that the Companies could go to FERC, even at this point).) In other words, the Companies chose their forum for litigation and lost. As the Supreme Court has stated,

> [p]ublic policy[] … dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest; and that matters once tried shall be considered forever settled as between the parties. We see no reason why this doctrine should not apply in every case where one voluntarily appears, presents his case and is fully heard, and why he should not, in the absence of fraud, be thereafter concluded by the judgment of the tribunal to which he has submitted his cause.

*Durfee*, 375 U.S. at 111-12 (internal quotation marks and citation omitted).[40]

---

[40] Our dissenting colleague believes that the policy interests in pre-emption outweigh those in applying issue preclusion. Even if her view of those policy interests were correct, however – and that is something as to which we make no further comment – the premise of her argument about pre-emption is problematic, for reasons we have noted already. She asserts that FERC has spoken in a binding way as to the classification of line losses. We respectfully disagree. While FERC has ruled on the method that PJM must use to calculate line losses, no one has presented to FERC the issue presented here, *i.e.*, how line losses should be categorized for billing

The Companies could have withdrawn their federal issues from the state proceeding and brought them in federal court, as has been done before. *See Ky. W. Va. Gas v. Pa. Pub. Util. Comm'n*, 837 F.2d 600, 604 n.2 (3d Cir. 1988) (noting that a gas utility that had appealed a PUC denial of a pass-through rate to the Commonwealth Court had withdrawn its constitutional claims from the state proceeding and brought them in federal court). The only reason the Companies proffered for not withdrawing their federal pre-emption issues was that they had to keep those issues before the Commonwealth Court to complete "[t]he legislative process." (Tr. at 23:1-2.) As we have explained, however, the state proceeding was a judicial process, not a legislative one, and the Companies' excuses now for not pursuing their claims in federal court in the first instance have the ring of post-hoc rationalization.[41]

---

purposes, especially in light of a settlement agreement of the sort involved in this case. (At least no one has directed our attention to such a FERC order.)

[41] In their supplemental briefing, the Companies argue that "[i]f the state court found the FERC tariff and precedent unclear, it should have certified the question to FERC itself." (Appellants' Supp. Br. at 3.) That, however, is immaterial because "[t]he relevant question … is not whether the [party] has been afforded access to a federal forum; rather, the question is whether the state court actually decided an issue of fact or law that was necessary to its judgment." *San Remo*, 545 U.S. at 342.

In the end, we are compelled to reject the Companies' efforts to pose their merits-based pre-emption arguments – the same ones that were rejected in the State Decision – as jurisdictional arguments. They would like, as the saying goes, to have it both ways – if they had obtained approval to charge their customers line-loss costs as a transmission cost, the PUC and the Commonwealth Court would have had jurisdiction to approve their proposed rates; otherwise, as they perceive it, the PUC and the Commonwealth Court must lack jurisdiction, and the Companies get a "do-over" with a clean slate in federal court. It is the classic "heads I win, tails you lose" approach to dispute resolution.[42] (Tr. at 5:9.) And it must fail because there is no sound justification for a rule that provides for jurisdiction in a state tribunal only when a pre-ordained merits outcome is reached by that tribunal.

---

[42] At oral argument, the Companies conceded that they were taking such a position. (Tr. at 5:8-19 ("THE COURT: So your position is really a heads I win, tails you lose position? … [COUNSEL FOR THE COMPANIES]: Well, that's the … characterization that the … opposing side put in their briefs[,] … but it's accurate.").) They tried to distance themselves from that characterization on rebuttal but simply highlighted their position that, again, the state had to decide in their favor on the merits. (*Id.* at 59:13-17 ("This is not a heads I win, tails you lose situation, really … . It's a … heads we all win if the State follows federal law, and tails we all win if … the State follows federal law.").)

## IV.    CONCLUSION

The Companies chose to challenge the PUC Order on direct appeal, and they must abide by the result.[43]    The operative concern before us is not whether the result of the state proceeding "got it right" but whether the Companies litigated the merits of the underlying issues legitimately and to finality.  They did.  To refuse to give the State Decision any preclusive effect would be a violation of the Full Faith and Credit Statute, which we cannot endorse.  *Cf. Underwriters Nat'l*, 455 U.S. at 694 (concluding that a state court's refusal to accord preclusive effect to another state's prior judgment was a violation of the Full Faith and Credit Clause and its implementing federal statute).

We will therefore affirm the District Court's dismissal of the Companies' amended complaint.

---

[43] Because all of the Companies' claims in this action are foreclosed by the doctrine of issue preclusion, we need not reach matters of claim preclusion, abstention, or judicial estoppel.

*Metropolitan Edison, et. al. v. PA Public Utility Commission, et. al.*

No. 13-4288

_____

ROTH, <u>Circuit Judge</u>, dissenting:

I do not dispute that the federal courts are precluded from reviewing a state court decision applying filed rates. However, I disagree with the majority that this is what is at issue. The issue here is whether the Commonwealth Court's misinterpretation of FERC orders, defining a component of a rate, is subject to collateral attack in federal court. I would hold that it is.

Contrary to the Commonwealth Court's assessment that the FERC orders in question are ambiguous, FERC has clearly classified the component "line loss" as a transmission related cost. *Atl. City Elec. Co. v. PJM Interconnection, LLC (Atlantic City I)*, 115 FERC ¶ 61,132 (2006); *Atl. City Elec. Co. v. PJM Interconnection, LLC (Atlantic City II)*, 117 FERC ¶ 61,169 (2006) (denying rehearing of *Atlantic City I*); *Pa.–N.J.–Md. Interconnection (PJM Interconnection I)*, 81 FERC ¶ 61,257 (1997); *Pa.–N.J.–Md. Interconnection (PJM Interconnection II)*, 92 FERC ¶ 61,282 (2000) (denying rehearing and granting clarification of *PJM Interconnection I*). I therefore respectfully dissent.

## I.    Background

1

The dispute here starts in June 2007, when PJM, a facility that transmits wholesale electricity over an interstate grid, implemented a new pricing scheme. *Atlantic City I*, 115 FERC ¶ 61,132. This change resulted in an additional amount of over $250 million being charged for line loss to the Companies when they purchased power from PJM to be resold at retail. Line loss is the power lost as electricity is transmitted over a distance. The Companies sought permission from the PUC to pass this line loss expense along to their retail ratepaying customers. The PUC denied the request. The PUC held that the line losses were related to the cost of generation, and that the Companies had agreed to postpone any increase in generation costs until 2010. The Companies appealed to the Commonwealth Court arguing that the new charges are related to transmission costs. The Commonwealth Court affirmed the PUC's determination reasoning that the PUC's classification was permissible because FERC has not expressly classified "line loss" as a transmission related cost. *Metropolitan Edison Co. v. Pa. Pub. Util. Comm'n*, 22A.3d 353, 365. The Commonwealth Court is incorrect. FERC has clearly classified line losses as a transmission related cost. As a consequence, the Commonwealth Court lacked jurisdiction to interpret the FERC orders.

To understand these issues, I will go back to the enactment of the Federal Power Act (FPA) and the ensuing FERC oversight of the interstate transmission of electric power. In 1927, the Supreme Court held that the sale of electricity in interstate commerce falls under the exclusive jurisdiction of Congress. *Pub. Utils. Comm'n v. Attleboro Steam & Elec. Co.*, 273 U.S. 83 (1927). In response, Congress enacted the FPA, "which authorized federal

2

regulation of the interstate sale of electricity, and created a new independent agency, the Federal Power Commission (precursor to FERC), to administer the statute." *N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 80 (3d Cir. 2014). The FPA grants FERC exclusive regulatory authority over "all the facilities for such transmission or sale of electricity," but reserves for the states regulatory authority over "facilities used for the generation of electric energy." *Id.* (citing 16 U.S.C. § 824). In addition, the FPA tasks FERC with ensuring that "[a]ll rates and charges … subject to the jurisdiction of the Commission … be just and reasonable." 16 U.S.C. § 824d(a). FERC's approach to this task has been to review rates proposed by each facility, rather than to directly set the rates itself. *N.J. Bd. of Pub. Utils.*, 744 F.3d at 81.

The Companies acquire electricity from PJM and deliver it to retail ratepayers. *Id* at 82. Pursuant to the FPA, the rate PJM charges the Companies for this transaction is regulated exclusively by FERC. *Id.* FERC has reviewed PJM's rates on various occasions. Relevant here is FERC's review of PJM rates calculated via the locational marginal pricing (LMP) methodology, which classifies line losses as a transmission related costs. *See PJM Interconnection I*, 81 FERC ¶ 61,257 (1997); *see also PJM Interconnection II*, 92 FERC ¶ 61,282 (2000)*; see also Atlantic City I*, 115 FERC ¶ 61,132 (2006); *see also Atlantic City II*, 117 FERC ¶ 61,169 (2006).

In *PJM Interconnection I*, FERC approved a proposal by PJM to begin calculating rates based on the LMP methodology. *Id.* 81 FERC ¶ 61, 257. The issue to be decided by this ruling was the allocation of the additional cost

3

to transmission caused by congestion of demand in certain areas. FERC summarized the purpose and mechanics of the LMP as follows:

> The Commission accepted, with certain modifications, the Supporting Companies' locational marginal pricing (LMP) model for calculating and recovering congestion costs. LMP is defined as the marginal cost of supplying the next increment of electric demand at a specific location on the electric power network, taking into account both generation and marginal cost and the physical aspects of the transmission system. When the PJM system is unconstrained, there is a single market clearing price for hourly energy equal to the marginal cost of meeting the last increment of demand. When transmission constraints occur on the PJM system, the marginal cost of energy varies by location because not all supply can be delivered to all demand. The differences between the LMPs at different locations represent congestion costs.

*PJM Interconnection II*, 92 FERC at p. 61,952. In other words, the LMP accounted for two components, (1) generation and (2) transmission constraints, and at this time transmission constraints consisted of only transmission congestion. The generation component pertained to the cost of providing electricity absent transmission constraints. The transmission constraints component pertained to the additional costs incurred to meet demand of providing electricity in congested areas, which increases as congestion

4

in an area increases. Accordingly, calculation of this cost creates an incentive for PJM to consider methods for alleviating congestion and "encourage[d] efficient use of the transmission system." *PJM Interconnection I*, 81 FERC at p. 62,253. For example, billing for congestion will "send price signals that are likely to encourage efficient location of new generating resources, dispatch of new and existing generating resources, and expansion of the transmission system." *Id.*

In *Atlantic City I*, FERC issued an order requiring PJM to account for a third component in the LMP, "transmission line losses." *Id.* 115 FERC ¶ 61,132. The "transmission line loss" component pertains to the additional costs incurred to compensate for the "loss of the scheduled megawatts as the power is transmitted from the point of generation to the point of delivery." *Id.* at p. 61,474. In other words, the longer the distance that electricity travels across a power line, the greater the loss of power, creating the additional cost necessary to compensate for the power lost in transmission, *i.e.*, line loss.

Prior to *Atlantic City*, "transmission line losses" were recovered under an average loss method. *Id.* at 61,473. The average loss method calculated losses separately from the LMP via an uplift charge, distributing losses equally among all loads. *Id.* In other words, customers in nearby locations paid the same amount as customers in more distant locations – the cost of the lost power being distributed equally among all customers. In *Atlantic City*, FERC mandated that PJM implement the marginal loss method, in which "the effect of losses on the marginal cost of delivering energy is factored into the energy price (*i.e.*, the Locational Marginal Price, or the LMP) at each location." *Id.* at 61,474. Under this method, the cost of line losses increases as the distance

5

between generator and user increased. *Id.* Akin to calculating congestion costs, calculating line losses is an incentive to PJM to use the transmission grid more efficiently. For example, in an effort to decrease the costs of line loss, PJM will consider distance in determining "which generators to dispatch to meet its loads." *Id.* [1]

Pertinent here, PJM implemented the marginal loss method in June 2007, resulting in new charges to the Companies, reflecting the cost of transmitting power over long distances. The Commonwealth Court, in affirming the PUC, misinterpreted the above mentioned FERC orders, holding these orders to be ambiguous. On this basis, the court denied the Companies' appeal to pass these costs on to retail ratepayers.

## II.    Preclusive Effects of the Commonwealth's Determination

How we frame the question presented in this case matters a great deal. The Companies do not question that the Commonwealth Court can review rates to be charged to retail customers, taking into account the interstate rate charged by PJM. Rather, the Companies ask us to review the Commonwealth Court's interpretation of one of these elements of the PJM rate, the charge for "line loss" as defined in the FERC orders.

---

[1]    In a separate order, FERC noted that prior to the implementation of the marginal loss method, "[l]osses were not included in the calculation of LMPs, and thus, were not recovered in the LMP energy prices collected from loads." *Black Oak Energy, LLC*, 122 FERC ¶ 61,208 (2008).

The FPA clearly divests states of jurisdiction to interpret FERC orders that define the elements of the rates of transmission facilities, such as PJM. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 911 F.2d 993, 1001 (5th Cir. 1990) ("*Nantahala* and *Mississippi Power and Light* reaffirmed the well-established principle that if FERC has jurisdiction over a subject, states cannot have jurisdiction over it"); *see also N.J. Bd. of Pub. Utils.*, 744 F.3d at 82 (FERC has jurisdiction over rates set by PJM). It is true that the states have flexibility in reviewing rates. However, once FERC has defined an element of a rate, the states cannot redefine it.[2] The Commonwealth Court acknowledged as much in its ruling on this matter. According to the court, "[b]ecause FERC's opinions have not expressly stated that line loss costs are transmission costs, there is no direct conflict between the Commission's Order and FERC." *Metropolitan Edison Co.*, 22 A.3d at 365. It is the Commonwealth Court's conclusion that there was no conflict here with FERC that is at issue. As explained in depth below, FERC has clearly defined the element of "line loss," and therefore, the Commonwealth Court's interpretation is preempted.

---

[2] It is FERC's prerogative to determine the elements that go into a filed rate. In *Nantahala* the element in question was the percentage of entitlement power to be allocated between two utilities. In the present case, the element is "line loss" and its classification by FERC as an element of transmission. Once FERC has spoken on the definition of any such element, the matter is preempted. The states may not then dispute that classification. The Commonwealth Court's conclusion that there was no conflict here with FERC is invalid for the reasons set forth above.

As the majority indicates, we are not bound by preclusion when "Congress expressly ousts state courts of jurisdiction." *Haywood v. Drown*, 556 U.S. 729, 771 (2009). Therefore, preclusion does not apply here.

Furthermore, the Supreme Court has cautioned that a state-court judgment is subject to collateral attack when "the policy underlying the doctrine of res judicata is outweighed by the policy against permitting the court to act beyond its jurisdiction." *Durfee v. Duke*, 375 U.S. 106, 115 n.12 (1963) (quoting Restatement (First) of Conflict of Laws § 451(2) (Supp. 1948)). In *Travelers Indemnity, Co. v. Bailey*, the Court provided similar guidance, noting that collateral attack is warranted under circumstances where "[a]llowing the judgment to stand would substantially infringe the authority of another tribunal or agency of government[.]" 557 U.S. 137, 153 n.6 (2009). Additionally, this Court has noted:

> When Congress intends a particular forum to have exclusive jurisdiction to determine the rights of the parties in a particular situation, that policy decision deprives other fora of subject matter jurisdiction. This doctrine of "forum preemption" implements Congressional determinations that development of the substantive law in a particular area should be left to a particular administrative agency created for that purpose.

*Ry. Labor Exec. Ass'n v. Pittsburgh & Lake Erie R.R. Co.*, 858 F.2d 936, 939 (3d Cir. 1988).

Here, it is clear that the policy interests in preemption outweigh the policy interests of applying issue preclusion. Allowing the Commonwealth Court's judgment to stand, without clarification, substantially infringes upon FERC's exclusive authority over its own orders. Furthermore, the Commonwealth should not be permitted to use filed rates as a pretense for construing FERC orders solely to benefit retail ratepayers, the constitutents of the PUC. Therefore, the Commonwealth Court's assessment of FERC orders, as ambiguous, is subject to collateral attack.

## III. Commonwealth's Review of FERC Orders

The Commonwealth Court's conclusion that the FERC orders "do not unambiguously state that [line losses] are transmission related" is flatly contradicted by FERC's persistent use of the term "transmission line losses" throughout the orders of *Atlantic City I* and *Atlantic City II. Metropolitan Edison Co.*, 22 A.3d at 356; *see* 115 FERC ¶ 61,132; *see also* 117 FERC ¶ 61,169. These repeated references explicitly classify "line losses" as related to "transmission."

Furthermore, the language quoted by the court to illustrate ambiguity does nothing of the sort. According to the Commonwealth Court, FERC associated line losses with both transmission and generation. *Metropolitan Edison Co.*, 22 A.3d at 365. First, the court referred to FERC's statement that "marginal losses are a part of the payment for transmission service." *Id.* (quoting 117 FERC at p. 61,863). Then, the court referred to language in *Atlantic City I* and *Atlantic City II* that seemingly associated line loss with the cost of generation. According to the Commonwealth Court:

> FERC stated "locational marginal prices [ (how line losses are calculated) ] are at the core of the PJM pricing methodology, because marginal prices send the proper price signals about the **cost of obtaining generation**." FERC then explained how line loss costs impact a utility's decision regarding from **which generator** to purchase energy. Similarly, in *Atlantic City I*, FERC noted that requiring PJM to charge for line loss on a locational marginal basis "ensures that each customer pays the proper marginal cost price for the **power it is purchasing**" and that, in using marginal pricing, "PJM would change the way that it dispatches generators by considering the effects of losses."

*Id.* (quoting *Atlantic City I*, 115 FERC at p. 61,478; *Atlantic City II*, 117 FERC at pp. 61,862, 61,863). The court was misguided.

In these statements, FERC simply illustrated the transmission related incentives that arise when line losses are calculated into the LMP. When line loss costs are calculated, PJM will attempt to shorten the route of delivering electricity by choosing the generators that are closest to the customers. Thus, this calculation encourages PJM to use the transmission system more efficiently. *Atlantic City I*, 115 FERC at 61,478.

Furthermore, FERC has indicated that similar incentives arise when congestion is calculated into the LMP, a cost that both the PUC and the Commonwealth Court have found to be related to transmission. *PJM Interconnection I*, 81 FERC at p. 62,253; *Metropolitan Edison Co.*, 22 A.3d at

10

356. FERC noted that calculating congestion costs would "send price signals that are likely to encourage efficient location of new generating resources, dispatch of new and existing generating resources, and expansion of the transmission system." *PJM Interconnection I*, 81 FERC at p. 62,253. Accordingly, the calculation "encourage[s] efficient use of the transmission system." *Id.* It is noteworthy that neither the PUC nor the Commonwealth Court found this statement to be ambiguous in their finding that congestion was related to transmission, and not generation.

Finally, the Commonwealth Court referred to language in *PJM Interconnection I and PJM Interconnection II* that seemingly associated line loss with the cost of generation. *Metropolitan Edison Co.*, 22 A.3d at 365. According to the court, "FERC did refer to the amount of line losses as being related to transmission; however, it also indicated that 'the price of line losses is related to generation, and the cost of generation is determined by LMP.'" *Id.* (quoting *PJM Interconnection*, 92 FERC at p. 61,960). The court took this statement out of context.

At the time *PJM Interconnection* was decided, the LMP calculated two cost components, generation and the transmission constraints of congestion. *PJM Interconnection II*, 92 FERC at 61,952. In *PJM Interconnection II*, FERC noted, "[w]hen transmission constraints occur on the PJM system, the marginal cost of energy varies by location because not all supply can be delivered to all demand." *Id.* Meanwhile, generation refers to the baseline cost for providing electricity absent transmission constraints, which does not vary by location. *Id.* At the time, line losses were not associated with transmission constraints, but rather, were

11

calculated via an uplift charge. *Atlantic City I*, 115 FERC at 61,473. Thus, like generation, line losses did not vary by location. It is therefore understandable why FERC, at that time, might categorize line losses with generation, as opposed to transmission.

However, under LMP, the Commonwealth Court's assessment of FERC orders as ambiguous is misplaced. It is clear that in conjunction with LMP, FERC has consistently classified line loss as a transmission related cost.

## IV. Conclusion

In focusing on the Companies' attempt to have us review the Commonwealth's substantive determination under the filed rate doctrine, the majority misses the forest for the trees. The state may not improperly interpret a matter outside of its jurisdiction when the matter has been left to the exclusive jurisdiction of FERC.[3] Because our review is not

---

[3] From the beginning the Companies have taken the position that this is a matter that can only be determined by FERC. And, in essence, this is the question asked by the Companies in their petition for certiorari to the Supreme Court:

> The Federal Power Act, 16 U.S.C. §§824 *et seq.*, grants the Federal Energy Regulatory Commission ("FERC") "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce." *New England Power Co. v. New Hampshire,* 455 U.S. 331, 340 (1982). A regional transmission

organization ("RTO") implementing its federal tariff charged petitioners for "transmission line losses" - the energy that dissipates when electricity is transmitted through wires. Although it was undisputed that the RTO imposed those charges as a cost of transmission, the Pennsylvania Public Utility Commission and the court below barred petitioners from recovering those federally imposed costs in retail rates by ruling that "transmission line losses" are generation costs (a cost of producing electricity), not transmission costs. Notwithstanding the filed rate doctrine, they deemed it irrelevant that the RTO had imposed the charges as "transmission" costs. They held that state regulators were free to recategorize the charges because FERC had not "unambiguously" or "explicitly" declared that "transmission line losses" are "transmission costs." The questions presented are:

*1. Whether, contrary to a decision of the Fifth Circuit, the Federal Power Act and filed rate doctrine permit a state public utility commission to deny recovery of FERC-mandated charges by classifying those costs differently from the entity responsible for administering the federal tariff on the ground that the tariff and FERC's orders do not "unambiguously" or "explicitly" foreclose the State's chosen classification.*

2. Whether, contrary to a decision of the D.C. Circuit, "transmission line losses" reflect

precluded and FERC has clearly spoken, I respectfully dissent. Thus, I conclude that this matter should be remanded to the District Court with instructions to issue an order enjoining the PUC and its Commissioners from asserting jurisdiction to define line losses in any manner other than is provided by FERC, *i.e.*, that "marginal losses are part of the payment for transmission service." *Atl. City Elec. Co.*, 117 FERC at 61,858.

---

the costs of generating electricity rather than the costs of transmitting it.

Petition for Writ of Certiorari, *Metro. Edison Co. v. Pa. Pub. Util. Comm'n*, 133 S.Ct. 426 (No. 12-4) (emphasis added). The fact that the Supreme Court did not grant certiorari does not mean that this question may not be validly raised in federal district court. *Cf. White v. Ragen*, 324 U.S. 760, 767 (1945) ("A denial of certiorari by this Court in such circumstances does not bar an application to a federal District Court for the relief, grounded on federal rights, which the Supreme Court of Illinois has denied.").